**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITIMORTGAGE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CHICAGO BANCORP, INC.,<br><br>THE FEDERAL SAVINGS BANK,<br><br>Serve at:<br>300 North Elizabeth St. Suite 3E<br>Chicago, IL 60607<br><br>NATIONAL BANCORP HOLDINGS, INC.,<br><br>Serve at:<br>300 North Elizabeth St. Suite 3E<br>Chicago, IL 60607<br><br>STEPHEN M. CALK, and<br><br>Serve at:<br>300 North Elizabeth St. Suite 3E<br>Chicago, IL 60607<br><br>JOHN T. CALK<br><br>Serve at:<br>300 North Elizabeth St. Suite 3E<br>Chicago, IL 60607<br><br>Defendants. | ) | Case No. 14-1278 |

**COMPLAINT**

Plaintiff CitiMortgage, Inc. ("CMI") states as follows for its Complaint against defendants, Chicago Bancorp, Inc. ("Chicago Bancorp"), The Federal Savings Bank ("FSB"), National Bancorp Holdings, Inc. ("NBH"), Stephen M. Calk, and John T. Calk:

## STATEMENT OF THE CASE

1. At all times relevant to this Complaint, CMI was in the business of, among other things, purchasing, reselling, and servicing residential mortgage loans on the secondary mortgage market. Chicago Bancorp was engaged in the business of originating, sourcing and/or reselling residential mortgage loans.

2. Chicago Bancorp has sold loans to CMI at least since 2004. At various times relevant to this Complaint, and as described in more detail below, Chicago Bancorp and CMI's relationship is and was governed by a contract entitled "Correspondent Agreement Form 200" dated as of April 12, 2004 (the "Form 200"), a Delegated Underwriting Addendum dated as of June 30, 2005 ("DU Addendum"), and a CMI Select Addendum dated as of August 15, 2007 ("Select Addendum"), (the Form 200 and the Amendments collectively referred to as the "Agreement").

3. Paragraph 1 of the Agreement expressly incorporates by reference as terms of the Agreement the CitiMortgage, Inc. Correspondent Manual (the "CMI Manual").

4. At various times since April 12, 2004, Chicago Bancorp sold loans to CMI that did not meet – or as to which Chicago Bancorp did not meet – various requirements under the Agreement. These unmet requirements include, but are not necessarily limited to, delivering loans: (a) that were underwritten and/or originated based upon materially inaccurate information or on material misrepresentations made by the borrower, Chicago Bancorp, Chicago Bancorp's directors, officers, employees, agents, independent contractors, and/or affiliates; (b) for which

CMI has discovered discrepancies regarding property ownership, income representations, employment representations, prior undisclosed mortgages or other debts, and/or occupancy; (c) for which applicable Fannie Mae, Freddie Mac, FHA, VA and/or HUD requirements and industry standards were not followed; or (d) that have turned out to be otherwise defective or not in compliance with the CMI Manual incorporated into the Agreement.

5. CMI gave notice of noncompliance to Chicago Bancorp and demanded that Chicago Bancorp meet the requirements contained in the Agreement. Despite these notices and demands, Chicago Bancorp failed to cure the defects in the specified loans or to repurchase the loans.

6. The Agreement provides CMI with the unilateral right to demand that Chicago Bancorp repurchase these loans. Because Chicago Bancorp failed to cure these defects or to comply with its repurchase obligations for 11 specific loans, CMI filed suit on February 13, 2012, for breach of the Agreement respecting those loans (No. 4:12-CV-00246-CDP—the "2012 Lawsuit").

7. Chicago Bancorp also failed to cure or repurchase an additional eighteen (18) defective loans and now owes CMI in excess of $4,500,000 in damages as a result of breaches of the Agreement respecting these additional loans. CMI brings the action herein to recover these damages as well as interest and any further actual and consequential damages resulting from Chicago Bancorp's additional breaches of the Agreement.

## PARTIES

8. CMI is a New York corporation having its principal place of business located in O'Fallon, Missouri.

9. Chicago Bancorp was, until dissolved, an Illinois corporation with its principal place of business located in Chicago, Illinois.

10. FSB is a thrift institution chartered by the federal Office of Thrift Supervision, subsequently merged with the Office of Comptroller of the Currency, with its home office headquarters and principal loan production offices located in the Chicago, Illinois, metropolitan area.

11. NBH is a holding company chartered by the federal Office of Thrift Supervision to own only thrift institutions, with its principal place of business located in Chicago, Illinois. On information and belief, FSB is a wholly owned subsidiary of NBH.

12. Stephen M. Calk is a resident of the State of Illinois, residing in the Chicago metropolitan area. He was President and, with his brother John T. Calk, owner of Chicago Bancorp.

13. John T. Calk is a resident of the State of Illinois, residing in the Chicago metropolitan area. He was Vice-President and, with his brother Stephen Calk, owner of Chicago Bancorp.

## JURISDICTION AND VENUE

14. Section 12 of the Agreement provides in relevant part that, "CMI and [Chicago Bancorp] agree that any action, suit or proceeding to enforce or defend any right or obligation under this Agreement or otherwise arising out of either party's performance under this Agreement shall be brought in . . . the United States District Court for the Eastern District of Missouri and each party irrevocably submits to the jurisdiction of [that] forum . . . ." This Court has jurisdiction over Chicago Bancorp because Chicago Bancorp has irrevocably submitted to this jurisdiction in the Agreement.

15. This Court also has jurisdiction over Chicago Bancorp because Chicago Bancorp transacted business in the State of Missouri by, among other things, selling and delivering loans to CMI within this judicial district.

16. The contractual consent to jurisdiction and venue in the United States District Court for the Eastern District of Missouri is imputed to FSB, NBH, and Stephen and John Calk (collectively, the "Calk defendants") as alter egos and/or successors of Chicago Bancorp.

17. FSB, NBH, and the Calk defendants also are subject to jurisdiction of courts within the State of Missouri under Missouri's long-arm statute, §506.500.1, R.S.Mo., in that they conspired together with Chicago Bancorp and/or manipulated Chicago Bancorp as its alter ego to commit the tort of fraudulent transfer as to present creditors within this State.

18. This Court has diversity subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because CMI and defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Venue is proper in this Court because the parties consented to this venue in the Agreement. Venue in this Court is also proper pursuant to 28 U.S.C. § 1391(a) and (c) in that this is the judicial district in which a substantial part of the events giving rise to the claim occurred and, for purposes of venue, defendants are deemed to reside in this judicial district.

## STATEMENT OF FACTS

19. On April 12, 2004, Chicago Bancorp and CMI entered into the Form 200.

20. On June 30, 2005, Chicago Bancorp and CMI entered into the DU Addendum, and on August 15, 2007, Chicago Bancorp and CMI entered into the Select Addendum.

21. True and correct copies of the Form 200 and the Amendments are attached hereto as Exhibit 1 to this Complaint and incorporated by reference herein.

22. Section 12 of the Agreement provides that "[t]his Agreement shall be governed by the laws of the State of Missouri and applicable federal law."

23. Section 1 of the Agreement provides that "[f]rom time to time, [Chicago Bancorp] may sell to CMI and CMI may purchase from [Chicago Bancorp] one or more residential mortgage, home equity or other loans" in accordance with the terms and conditions in the CMI Manual.

24. Section 1 of the Agreement provides that in connection with the sale of loans, Chicago Bancorp will deliver loan documentation to CMI in accordance with the terms and conditions of the CMI Manual, that CMI may or may not conduct a complete review of the loan documents at issue, and that CMI's review or failure to review loan documents does not affect CMI's rights to demand repurchase of defective loans or any other rights or remedies under the Agreements.

25. In Section 2(g) of the Agreement, Chicago Bancorp agreed to obtain and review the CMI Manual promptly and to comply with all of its terms, conditions, requirements, and procedures.

26. In Section 10 of the Agreement, Chicago Bancorp agreed to "indemnify and hold CMI harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) [Chicago Bancorp's] performance or failure to perform under the terms, conditions or obligations of this Agreement or the CMI Manual (including but not limited to [Chicago Bancorp's] failure to timely deliver all documents and records associated with or related to all Loans purchased by CMI pursuant to this Agreement), [or] (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant contained [in] this Agreement or the CMI Manual . . . ."

27. Section 11 of the Agreement provides, in relevant part:

> If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:
>
> (i) was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;
>
> (ii) was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), [Chicago Bancorp], [Chicago Bancorp's] directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan;
>
> . . .
>
> [Chicago Bancorp] will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI. If, after receiving such notice from CMI, [Chicago Bancorp] is unable to correct or cure such defect within the prescribed time, [Chicago Bancorp] shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate.

23. Furthermore, the DU Addendum provides, in relevant part:

> [Chicago Bancorp] expressly agrees that it shall underwrite each Loan in conformity with the applicable underwriting criteria of CMI. If an audit by CMI on any Loan reveals that it was underwritten in violation of the applicable CMI underwriting criteria, [Chicago Bancorp] will, not later than thirty (30) days after receipt of written notice from CMI, repurchase the Loan at the Repurchase Price or provide CMI with written evidence as to why [Chicago Bancorp] believes such underwriting criteria was not violated. If, after reviewing [Chicago Bancorp's] written evidence, CMI, in its sole and independent discretion, determines the Loan was not originated in accordance with the applicable underwriting criteria, [Chicago Bancorp] will, not later than thirty (30) days after receiving further written notice from CMI, repurchase the Loan at the Repurchase Price specified in the Agreement, Manual and/or applicable Bulletins.

28. Thus, Section 11 of the Agreement and the DU Addendum give CMI the sole discretion to determine whether a loan meets the specified qualifications and the sole discretion to determine whether to demand cure or repurchase of a given loan for failure to meet these qualifications.

29. Chicago Bancorp sold CMI at least eighteen loans in addition to those in the 2012 Lawsuit (a) that were underwritten and/or originated based upon materially inaccurate information or on material misrepresentations made by the borrower, Chicago Bancorp, Chicago Bancorp's directors, officers, employees, agents, independent contractors, and/or affiliates; (b) for which CMI has discovered discrepancies regarding property ownership, income representations, employment representations, prior undisclosed mortgages or other debts, and/or occupancy; (c) for which applicable Fannie Mae, Freddie Mac, FHA, VA and/or HUD requirements and industry standards were not followed; and/or (d) that have turned out to be otherwise defective or not in compliance with the CMI Manual incorporated into the Agreement.

30. CMI sent notice of these defects and demanded that Chicago Bancorp cure or repurchase these loans.

31. Chicago Bancorp neither cured the defects in these loans nor repurchased them as required by the Agreement.

32. As a result, Chicago Bancorp is required to indemnify CMI for all losses associated with these loans or to repurchase these loans and indemnify for all losses in addition to the repurchase amount.

33. Chicago Bancorp's breaches of the Agreement respecting the 18 additional loans have resulted in total amounts due to CMI in excess of $4,500,000, excluding interest, fees, costs, and other expenses Chicago Bancorp owes CMI.

34. At the end of 2010, FSB, which was formerly known as Generations Bank, was a subsidiary of a bankrupt thrift institution holding company and subject to an Office of Thrift Administration cease and desist order requiring it either to increase its capital by merging with or being acquired by a financially healthy thrift or thrift holding company or to dissolve. According

to newspaper accounts at the time, Generations Bank had not made a profit since 2007. The Calk defendants purchased Generations Bank in or about April 2011 as a subsidiary of NBH, which they own and had created shortly before the purchase for the purpose of owning Generations Bank; and they renamed Generations Bank as The Federal Savings Bank. According to its own press releases, FSB was named by the American Bankers Association Journal in mid-2012 as the most profitable bank in America with assets less than $100,000,000.

35. On information and belief, in early 2011, while CMI and Chicago Bancorp were discussing CMI's mounting repurchase demands, the Defendants began assigning key Chicago Bancorp employees to generate mortgage loan revenue for the benefit of FSB while they were still employed at and paid by Chicago Bancorp. These key employees included one of Chicago Bancorp's top revenue-producing managers in the consumer direct mortgage division and his team. During 2011 and early 2012, the President of Chicago Bancorp's consumer direct mortgage division spent approximately half of his time running FSB's consumer direct mortgage division. In mid-2011, Chicago Bancorp hired a new Managing Director of its consumer direct mortgage division to assist the leadership in running that division. During the latter part of 2011 and early 2012, he spent approximately 40% of his time working for the benefit of FSB by assisting in the management of its consumer direct mortgage division, while still employed at and paid by Chicago Bancorp. On information and belief, FSB received credit for the revenue generated by these Chicago Bancorp employees; but their salaries and benefits were charged to Chicago Bancorp, all to the detriment of Chicago Bancorp's financial performance.

36. Chicago Bancorp was profitable throughout the recent recession, with net income before taxes in the years 2007 through 2011 ranging between a high of $2.9 million in 2007 and a low of $1.7 million in 2011. Despite these profits, during the same time period, the net worth

of the company (shareholder equity) increased only $0.7 million because Chicago Bancorp distributed more than $10 million to Stephen and John Calk as its shareholders rather than keeping the profits in the company as retained earnings. Chicago Bancorp had a net worth (Stockholders' Equity) of $5,480,173 as of December 31, 2011.

37. During 2012, after CMI reached an impasse in its negotiation of repurchase claims with Chicago Bancorp and filed the 2012 Lawsuit, Chicago Bancorp began to wind down and go out of the business of originating mortgage loans. New loans peaked at a high for the year of 327 in March and declined steadily each successive month until the last 16 loans were originated in October (15) and November (1). Despite this process of going out of business, Chicago Bancorp showed a profit of $1,179,414 for the portion of 2012 it was operating. Chicago Bancorp's 2012 U.S. Income Tax Return for an S Corporation reported distributions to shareholders other than dividend distributions of $4,618,900 (in addition to $1,217,292 paid to the two shareholders as "compensation" for that year) and year-end Shareholders' Equity of $1,656,703.

38. On information and belief, the net worth of Chicago Bancorp declined further in the first few months of 2013 and may have been effectively close to zero, with little cash and most of its assets consisting primarily of uncollectible mortgages with a book value of approximately $750,000. When Chicago Bancorp was confronted with these allegations in the 2012 Lawsuit, it purportedly deposited cash into its accounts to bring its total book value to approximately $2.5 million and cash to nearly $1.9 million, the approximate amount of the prayer in the 2012 Lawsuit.

39. In the spring of 2012, as is reflected in the decline in the origination of new mortgage loans by Chicago Bancorp, the Defendants accelerated the process of transferring the

business operations of Chicago Bancorp to FSB. On information and belief, during the second half of 2012 and the first quarter of 2013, all or substantially all of the assets of Chicago Bancorp needed for operation of a mortgage loan business were transferred, directly or indirectly, through defendant NBH and/or defendants Stephen and John Calk, the principals and ultimate owners of all three defendants, to defendant FSB, which continued Chicago Bancorp's business of originating mortgage loans with Chicago Bancorp's employees in the same locations. On information and belief, the President of Chicago Bancorp's consumer direct mortgage division became President, Consumer Direct Lending, at FSB; and the Managing Director of Chicago Bancorp's consumer direct lending division became Executive Vice President Consumer Direct Lending at FSB. Also on information and belief, Stephen and John Calk retained an unknown amount of the non-dividend distributions that they received from Chicago Bancorp during 2012.

40. Stephen Calk and John Calk initiated proceedings for the dissolution of Chicago Bancorp with the Illinois Secretary of State in August 2012 and formally authorized its dissolution in a Written Consent of Shareholders executed as of December 28, 2012; and John Calk filed Articles of Dissolution of Chicago Bancorp as its President with the Illinois Secretary of State on January 4, 2013. The Illinois Secretary of State shows Chicago Bancorp's status as dissolved.

**COUNT I: BREACH OF CONTRACT**

41. CMI hereby incorporates its allegations in paragraphs 1 through 40 of this Complaint as if they were set forth fully herein.

42. As set forth in greater detail in paragraphs 19 through 33 above, Chicago Bancorp breached the Agreement when it delivered loans that failed to conform to the terms of the

Agreement and subsequently refused to cure those nonconforming loans or repurchase those loans.

43. **Alvarez Loan #XXXXXX8594.** CMI demanded the cure or repurchase of the loan on December 12, 2012, and January 22, 2013, based on its determination that: (i) the loan application package misrepresented borrower income; and (ii) the debt-to-income ratio failed to satisfy guidelines.

44. **Bastos Loan #XXXXXX4000.** CMI demanded the cure or repurchase of the loan on July 21, August 25, and September 13, 2011, based on its determination that: (i) the loan application package misrepresented borrower employment and income; and (ii) the debt-to-income ratio failed to satisfy guidelines.

45. **Cadet Loan #XXXXXX6174.** CMI demanded the cure or repurchase of the loan on July 25, 2011, February 15, 2012, and March 26, 2012, based on its determination that: (i) the loan application package misrepresented borrower debts and obligations; (ii) the loan was underwritten in violation of program requirements (borrower had impermissible home equity line of credit); and (iii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

46. **Castro Loan #XXXXXX9106.** CMI demanded the cure or repurchase of the loan on September 22, 2010, and March 2 and April 11, 2011, based on its determination that: (i) the loan application package misrepresented the borrower's debts and obligations; (ii) the loan application package misrepresented borrower income; (iii) the debt-to-income ratio failed to satisfy guidelines; and (iv) the origination appraisal was unsupported in that it failed to comply with guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

47. **Hernandez Loan #XXXXXX2003.** CMI demanded the cure or repurchase of the loan on October 11, 2010, and March 18 and April 20, 2011, based on its determination that the loan application package failed to provide required documentation of borrower income. In addition, CMI was required to repurchase the loan from Fannie Mae.

48. **Hoagland Loan #XXXXXX2884.** CMI demanded the cure or repurchase of the loan on April 18, June 9, and July 26, 2011, based on its determination that: (i) the loan application package misrepresented the borrower's debts and obligations; and (ii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

49. **Johnson Loan #XXXXXX3165.** CMI demanded the cure or repurchase of the loan on February 4, April 23, and May 28, 2013, based on its determination that: (i) the origination appraisal was unsupported in that it failed to comply with guidelines; and (ii) the loan-to-value ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

50. **Kulis Loan #XXXXXX4854.** CMI demanded the cure or repurchase of the loan on September 8, 2011, December 6, 2011, and January 11, 2012, based on its determination that: (i) the loan application package misrepresented borrower income; and (ii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

51. **Marino Loan #XXXXXX3386.** CMI demanded the cure or repurchase of the loan on January 18, April 10, and June 19, 2013, based on its determination that: (i) the loan application package failed to provide required documentation of borrower income; and (ii) the

debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

52. **Martinez Loan #XXXXXX6748.** CMI demanded the cure or repurchase of the loan on August 25, 2011, February 15, 2012, and March 27, 2012, based on its determination that: (i) the loan application package misrepresented the borrower's debts and obligations; (ii) the debt-to-income ratio failed to satisfy guidelines; and (ii) the loan violated applicable guidelines in that the borrower owned other real estate in violation of program requirements. In addition, CMI was required to repurchase the loan from Fannie Mae.

53. **Meza Loan #XXXXXX0029.** CMI demanded the cure or repurchase of the loan on October 31, 2012, January 30, 2013, and March 4, 2013, based on its determination that the borrower provided a false Social Security Number belonging to another individual. In addition, CMI was required to repurchase the loan from Freddie Mac.

54. **Montana Loan #XXXXXX0878.** CMI demanded the cure or repurchase of the loan on February 22, 2012, May 10, 2012, and July 6, 2012, based on its determination that: (i) the loan application package misrepresented borrower income; and (ii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

55. **Najfi Loan #XXXXXX8333.** CMI demanded the cure or repurchase of the loan on June 22, 2010 and July 20, 2012, and September 12, 2012, based on its determination that: (i) the loan application package misrepresented borrower income; and (ii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

56. **Pedro Loan #XXXXXX3676.** CMI demanded the cure or repurchase of the loan on October 18, 2010, and March 17 and April 20, 2011, based on its determination that: (i) the loan application package misrepresented borrower debts and obligations; and (ii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

57. **Riley Loan #XXXXXX8221.** CMI demanded the cure or repurchase of the loan on September 27, 2012, December 27, 2012, and February 4, 2013, based on its determination that: (i) the loan application package misrepresented borrower income; and (ii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Freddie Mac.

58. **Swain Loan #XXXXXX4712.** CMI demanded the cure or repurchase of the loan on May 9, June 20, and September 13, 2013, based on its determination that: (i) the loan application package misrepresented borrower income and failed to comply with guidelines; (ii) the loan application package misrepresented borrower debts and obligations; and (iii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

59. **Williams Loan #XXXXXX2385.** CMI demanded the cure or repurchase of the loan on June 28, 2010 and March 3 and April 11, 2011, based on its determination that: (i) the loan application package misrepresented borrower debts and obligations; and (ii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Fannie Mae.

60. **Zavala Loan #XXXXXX1649.** CMI demanded the cure or repurchase of the loan on April 29, June 10, and July 29, 2013, based on its determination that: (i) the loan

application package misrepresented borrower debts and obligations; and (ii) the debt-to-income ratio failed to satisfy guidelines. In addition, CMI was required to repurchase the loan from Freddie Mac.

61. Chicago Bancorp failed to cure the defects identified with respect to these eighteen loans in response to CMI's demands and failed to repurchase these loans pursuant to CMI's demands.

62. As a result, Chicago Bancorp breached the Agreement, and CMI has been damaged in an amount in excess of $4,500,000, the exact amount to be proved at trial.

63. All conditions precedent, concurrent, or subsequent to CMI's rights and ability to bring this claim have taken place, have otherwise been met, have been waived, or have otherwise been excused.

**COUNT II: STATUTORY FRAUDULENT TRANSFER**

64. CMI hereby incorporates its allegations in paragraphs 1 through 63 of this Complaint as if they were set forth fully herein.

65. Section 428.029, R.S.Mo., provides that a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonable equivalent value in exchange for the transfer and the debtor was insolvent at that time or became insolvent as a result of the transfer. Section 428.024, R.S.Mo., provides that a transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with the actual intent to hinder, delay, or defraud any creditor of the debtor.

66. The Calk defendants transferred substantially all of the assets of Chicago Bancorp to themselves as distributions to shareholders and/or to NBH and ultimately to FSB after

discussions regarding CMI's then pending repurchase demands reached an impasse and CMI filed the 2012 Lawsuit, leaving Chicago Bancorp insolvent and without assets to pay the claims of CMI.

67. Chicago Bancorp received nothing of value in exchange for its assets that were transferred to the other defendants.

68. Chicago Bancorp and the other defendants made the transfer of Chicago Bancorp's assets with the actual intent to hinder, delay, and prevent CMI from collecting amounts due to it in payment of repurchase claims against Chicago Bancorp.

69. Chicago Bancorp, NBH, and FSB, after a meeting of the minds and at the direction of the Calk defendants, agreed and conspired to transfer Chicago Bancorp's assets among themselves with the purpose and effect of leaving Chicago Bancorp unable to pay a judgment against it in favor of CMI and to conceal from CMI the fact that these assets had been moved.

70. As a result of the foregoing actions, CMI has been further damaged in excess of $4,500,000, with the exact amount to be proved at trial.

71. Section 428.039, R.S.Mo., provides relief for a fraudulent transfer in violation of Section 428.029 or Section 428.024 and specifies remedies, including provisional remedies such as attachment of the assets transferred.

72. The defendants' conduct was outrageous because of their evil motive or reckless indifference to the rights of CMI.

**COUNT III: ALTER EGO LIABILITY FOR BREACH OF CONTRACT**

73. CMI hereby incorporates its allegations in paragraphs 1 through 72 of this Complaint as if they were set forth fully herein.

74. As is described in paragraphs 19 through 33 above, the Chicago Bancorp Agreement was breached by the failure of Chicago Bancorp to repurchase the Loans as demanded by CMI pursuant to the Chicago Bancorp Agreement.

75. The Calk defendants completely dominated and controlled Chicago Bancorp, NBH, and FSB as their sole owners and principal executives.

76. The Calk defendants used the corporate cloak of Chicago Bancorp as a subterfuge to justify and to perpetuate a fraud against CMI by transferring all or substantially all of Chicago Bancorp's assets and operations to themselves and to FSB and out of the reach of CMI.

77. The transfer of Chicago Bancorp's assets and operations was conducted in a way that left Chicago Bancorp without the ability to pay repurchase claims of CMI. Thus, the relationship between Chicago Bancorp and the other defendants was manipulated through this transfer in a way that would allow Chicago Bancorp to avoid its repurchase liability if the other defendants are not found to be liable as the alter ego of Chicago Bancorp. This manipulation of Chicago Bancorp was a wrong, perpetrated in violation of a contractual duty to pay repurchase claims, and an unjust act in contravention of CMI's rights. Equity demands that the Calk defendants and/or FSB and NBH be held liable for Chicago Bancorp's breach of the Chicago Bancorp Agreement because of this manipulation of the interrelationship among the defendant companies to evade Chicago Bancorp's obligations to CMI.

**COUNT IV: SUCCESSOR LIABILITY FOR BREACH OF CONTRACT**

78. CMI hereby incorporates its allegations in paragraphs 1 through 77 of this Complaint as if they were set forth fully herein.

79. As described in paragraphs 19 through 33 above, the Chicago Bancorp Agreement was breached by the failure of Chicago Bancorp to repurchase the Loans as demanded by CMI pursuant to the Chicago Bancorp Agreement.

80. The transfer of Chicago Bancorp's assets and operations constitutes a transaction which amounts to a mere continuation of Chicago Bancorp and/or a de facto merger of Chicago Bancorp and FSB.

81. FSB continued the enterprise that formerly was Chicago Bancorp, preserving a continuity of management, personnel, physical location, assets, and general business. The Calk defendants, who were the principal executives of Chicago Bancorp are the principal executives of FSB. The President and the Managing Director of Chicago Bancorp's consumer direct lending division became the President and the Executive Vice President of the corresponding operations at FSB. Chicago Bancorp offices became FSB offices, staffed with Chicago Bancorp loan officers and other personnel, and the former Chicago Bancorp employees continued processing mortgage loan applications as they had been processing them when they were Chicago Bancorp employees and soliciting new mortgage loans of the same type.

82. There is a continuity of ownership between Chicago Bancorp and FSB, with Chicago Bancorp, NBH, and FSB all being owned solely by Stephen and John Calk.

83. Generations Bank was insolvent or nearly insolvent in 2011 when the Calk defendants acquired it and renamed it The Federal Savings Bank. On information and belief, all or substantially all of the assets of Chicago Bancorp necessary to the operation of a mortgage loan origination business were transferred to FSB, either directly or indirectly, through the Calk defendants, and all or substantially all of the assets used to capitalize FSB after its acquisition

came directly or indirectly from Chicago Bancorp, in the form of non-dividend distributions to shareholders or otherwise.

84. Equity demands that FSB be held liable, as the successor to Chicago Bancorp, for breach of the Chicago Bancorp Agreement.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, CitiMortgage, Inc., asks that this Court enter judgment in its favor and against defendants Chicago Bancorp, Inc., The Federal Savings Bank, National Bancorp Holdings, Inc., Stephen M. Calk, and John T. Calk for (i) damages in an amount to be proven at trial, (ii) an order requiring defendants to perform Chicago Bancorp, Inc.'s obligations under the Agreement with CMI, including, but not limited to, repurchase of defective loans, (iii) plaintiff's costs and attorneys' fees in prosecuting this action, (iv) pre-judgment interest through the date of judgment, (v) post-judgment interest as provided by law, (vi) punitive and exemplary damages, (vii) such provisional remedies provided in §428.039, R.S.Mo., as may be necessary to do justice such as attachment against the Chicago Bancorp assets transferred or other property of the transferee, appointment of a receiver to take charge of these assets, and an injunction against further disposition by Chicago Bancorp or a transferee of these assets, and (viii) such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: July 18, 2014

**BRYAN CAVE LLP**

By: /s/ Louis F. Bonacorsi
Louis F. Bonacorsi, #28331MO
lfbonacorsi@bryancave.com
Ketrina G. Bakewell, #33410MO
ketrina.bakewell@bryancave.com
Stephen R. Snodgrass, #29017MO
srsnodgrass@bryancave.com
211 North Broadway, Suite 3600
St. Louis, MO 63102
(314) 259-2000
(314) 259-2020 (facsimile)

ATTORNEYS FOR PLAINTIFF
CITIMORTGAGE, INC.

CORRESPONDENT
AGREEMENT
FORM 200

This Correspondent Loan Purchase Agreement ("Agreement"), dated the 12th day of April, 2004, by and between CitiMortgage, Inc. ("CMI"), for itself and on behalf of Citibank, FSB, Citibank (West), FSB, and Citibank, N.A., and;

Chicago Bancorp, Inc. ("Correspondent").

In consideration of the terms contained in this Agreement, CMI and Correspondent agree as follows:

1. PURCHASE AND SALE OF MORTGAGE LOANS

From time to time, Correspondent may sell to CMI and CMI may purchase from Correspondent one or more residential mortgage, home equity or other loans ("Loan(s)") in accordance with the terms, conditions, requirements, procedures, representations and warranties set forth in the "CitiMortgage, Inc. Correspondent Manual" and all amendments, bulletins, program requirements and supplements to such Manual (collectively hereinafter referred to as the "CMI Manual"), and this Agreement. CMI and Correspondent agree that the CMI Manual is incorporated by reference herein and is part of this Agreement. Further, CMI and Correspondent agree that Citibank, FSB; Citibank (West), FSB; and Citibank, N.A. are intended third party beneficiaries of this Agreement.

For each Loan offered for sale by Correspondent to CMI, Correspondent will deliver Loan documentation to CMI in accordance with the applicable terms, conditions, requirements, procedures, representations and warranties set forth in the CMI Manual. CMI may purchase Loans with or without conducting a complete review of the Loan documentation. CMI's review of, or failure to review, all or any portion of the Loan documentation shall not affect CMI's rights to demand repurchase of a Loan or any other CMI right or remedy provided by this Agreement.

For each Loan CMI agrees to purchase, CMI shall pay the amount agreed upon by CMI and Correspondent ("Purchase Price") in accordance with the applicable provisions of the CMI Manual. CMI may offset against the Purchase Price any outstanding fees or other amounts owing from Correspondent to CMI in connection with the particular purchase or other transactions.

As of the date CMI purchases each Loan, Correspondent will (i) transfer to CMI all of its right, title and interest in and to each Loan, including without limitation all documents held or subsequently acquired by Correspondent relating to each Loan and (ii) execute all documents necessary to transfer such right, title and interest to CMI.

2. REPRESENTATIONS AND WARRANTIES

Correspondent represents, warrants and covenants throughout the term of this Agreement as follows:

(a) That it is duly organized, validly existing, in good standing, qualified and authorized to do business in each jurisdiction where it originate Loans or where a property securing any of its Loans is located; that all corporate or other actions and approvals necessary for the execution and performance of this Agreement have been taken and/or received; and that no consent from any third party is required for the execution and performance of this Agreement.

(b) That it (i) holds and shall maintain in good standing throughout the term of this Agreement all applicable license(s) and/or registration(s) in each jurisdiction that is/are necessary for Correspondent's Loan origination, purchase and sale activities under this Agreement and (ii) is in full compliance with all laws in each jurisdiction which govern Correspondent's activities under this Agreement. Correspondent agrees to promptly provide CMI with copies of all such license(s) and/or registration(s) upon request by CMI.

(c) That it will allow CMI to periodically investigate the financial (including but not limited to obtaining corporate and/or individual credit reports) and other status of Correspondent and, if necessary, the financial and other status of Correspondent's directors, officers and/or employees. If necessary, Correspondent shall cooperate with CMI to obtain the written consent of one or more of Correspondent's directors, officers and/or employees to such periodic investigation. Correspondent agrees that the failure to obtain such consent may result in the termination of this Agreement in accordance with the provisions of Sec. 7.

 39230 (12/03)

Exhibit 1

(d) That it is thoroughly familiar with and will comply with all applicable federal (including but not limited to the Real Estate Settlement Procedures Act, Truth-In-Lending Act, Equal Credit Opportunity Act and federal fair lending laws), state and, if necessary, local laws and regulations directly or indirectly relating to its activities under this Agreement (including but not limited to involvement in such activities of individuals convicted of crimes involving dishonesty or breach of trust).

(e) That Correspondent is an approved seller/servicer of conventional residential adjustable and fixed-rate mortgage Loans for Fannie Mae, Freddie Mac, and/or is a FHA-, VA- and/or HUD-approved mortgagee ; that Correspondent is duly qualified, licensed, registered and otherwise authorized under all applicable laws and regulations and is in good standing to (i) originate, sell, endorse and assign Loans and, if applicable, the related Loan collateral to CMI, (ii) service Loans in the jurisdiction(s) where, if applicable, the properties securing such Loans are located for Fannie Mae, Freddie Mac, FHA or VA, and (iii) no event has occurred that would make Correspondent unable to comply with Fannie Mae, Freddie Mac, FHA, VA or HUD eligibility requirements or that would require notification to Fannie Mae, Freddie Mac, FHA or VA or HUD.

(f) That it does not believe, nor does it have any reason or cause to believe, it cannot perform every covenant contained in this Agreement or continue to carry on its business substantially as now conducted; that it is solvent and the sale of Loans will not cause it to become insolvent; that no action, suit, proceeding or investigation pending or threatened against Correspondent, either alone or in the aggregate, may result in its inability to carry on its business substantially as now conducted; and that the sale of Loans under this Agreement is not undertaken with the intent to hinder, delay or defraud any of its creditors.

(g) That it has obtained and reviewed or will, upon execution of this Agreement, promptly obtain and review the CMI Manual and will fully comply with its terms, conditions, requirements and procedures.

(h) That it does not currently and will not in the future employ any entity or individual on the Freddie Mac exclusionary list.

(i) That neither this Agreement nor any statement, report or other information provided or to be provided pursuant to this Agreement (including but not limited to the statements and information contained in the documentation for each Loan purchased by CMI) contains or will contain any misrepresentation or untrue statement of fact or omits or will omit to state a fact necessary to make the information not misleading. The provisions of this sub-section shall not apply to information obtained from (i) appraisers, escrow agents, title companies, closers, credit reporting agencies or any other entity approved by CMI ("Approved Entity") unless Correspondent knows or has reason to believe that any information provided by such Approved Entity is not true, correct or valid in any material respect and (ii) the Loan applicant(s) unless Correspondent knows, has reason to believe or, after performing its normal due diligence and quality control review, should have known that any information provided by the Loan applicant(s) is not true, correct or valid in any material respect.

(j) That the documentation for each Loan sold to CMI (i) shall be duly executed by the borrower(s), (ii) shall create a valid and legally binding obligation of the borrowers(s) and (iii), if applicable, shall create a fully enforceable first or subordinate lien on the property securing repayment of the Loan.

(k) That each mortgage, home equity or other Loan (i) shall be fully enforceable and originated in accordance with the terms, conditions, representations, warranties and covenants contained in the CMI Manual and this Agreement which were in effect as of the Loan closing date, (ii), if applicable, was serviced in accordance with applicable Fannie Mae, Freddie Mac, FHA, VA and/or HUD requirements and industry standards, and (iii) is subject to no defects or defenses, including but not limited to damage to the property securing the Loan, lien imperfections or environmental risk.

(l) That any third-party originators referring, or in any way involved with, any Loan shall be, at a minimum, approved by Correspondent according to Fannie Mae, Freddie Mac, FHA, VA and/or HUD guidelines for approving third-party originators as described in the CMI Manual.

(m) That it will immediately notify CMI if it (i) fails to maintain any license or registration in violation of Sec. 2(b) above and/or (ii) becomes subject to any enforcement and/or investigative

proceeding by any licensing or regulatory authority or agency and/or (iii) is named as a party or becomes involved in any material litigation.

(n) That it will immediately notify CMI if (i) Correspondent and/or any of its principal director(s) or owner(s) becomes the debtor in any voluntary or involuntary bankruptcy proceeding, (ii) Correspondent and/or any of its principal director(s) or owner(s) requests the appointment of a receiver and/or (iii) Correspondent and/or any of its principal director(s) or owner(s) has incurred or is likely to incur a material, adverse change in its/their financial condition.

(o) That it will immediately notify CMI of any material change in ownership and/or management.

(p) That it will promptly respond to or otherwise comply with CMI's reasonable request(s) for periodic financial statements of Correspondent and/or any of its principal director(s) or owners and any other documentation required by CMI in connection with the recertification of Correspondent.

(q) That it will fully comply with all additional representations, warranties and covenants contained in the CMI Manual.

(r) That all representations, warranties and covenants contained in this Agreement and the CMI Manual shall survive the expiration and termination of this Agreement.

## 3. COSTS

Correspondent shall pay all costs and expenses incurred in connection with the transfer and delivery of Loans to CMI purchased pursuant to this Agreement, including but not limited to mortgage Loan assignment preparation and recording fees, fees for title policy endorsements and continuations, and Correspondent's attorneys' fees.

## 4. CORRESPONDENT ADVERTISING; NON-SOLICITATION AND CUSTOMER PRIVACY

Correspondent may advertise to the public the availability of various Loan programs, but Correspondent may not, in any way, directly or indirectly identify CMI in all such advertising unless (i) required by applicable law or (ii) CMI has, in advance, approved use of CMI's name in such advertising.

Correspondent agrees that the borrower(s) on all Loans shall, at the time of purchase by CMI, become the exclusive customers of CMI for all Loan-related purposes. During the first twelve (12) months after the date any Loan is purchased by CMI, Correspondent represents and warrants that Correspondent, Correspondent's directors, officers, employees, agents or affiliates will not, without the prior consent of CMI, (i) use targeted advertising, solicit or otherwise directly encourage or incent the Loan borrower(s) to refinance or prepay the Loan that was purchased by CMI, (ii) prepare, sell or distribute any customer list incorporating the names, addresses or any non-public personal information of such borrower(s) or (iii) use any such customer list to solicit, promote, or allow any other entity to solicit or promote, the sale of financial services or products to any such borrower(s). CMI and Correspondent agree that nothing contained herein shall prohibit advertising or solicitation by Correspondent that is directed to the general public in the area where the Loan borrower(s) reside(s).

Correspondent acknowledges that it has received a copy of the Citigroup Privacy Promise and/or Citigroup Privacy Policy and, to the extent necessary, shall comply with all applicable provisions of such Promise and/or Policy. Correspondent also agrees that it shall comply with all applicable federal or state laws related to the use and/or retention of the non-public personal and/or financial information associated with all Loans and the related Loan borrower(s).

## 5. TERM

This Agreement is for an initial one-year term and shall automatically renew for successive one-year terms, unless terminated pursuant to Section 7 of this Agreement.

6. RELATIONSHIP BETWEEN CMI AND CORRESPONDENT

This Agreement will not create any agency between Correspondent and CMI. Correspondent shall conduct its business under this Agreement as an independent contractor and shall have the rights and responsibilities of an independent contractor.

CMI shall not be responsible for any actions or omissions by Correspondent. Correspondent agrees it will not represent, orally, in writing, by implication or otherwise, that it can act in any capacity on behalf of CMI.

CMI is prescribing no marketing plan for Correspondent and exercises no control over the methods, operations and practices of Correspondent except as provided in this Agreement and the CMI Manual.

Correspondent acknowledges it is not selling or distributing CMI's services, and CMI has made no promise, representation or warranty regarding the profitability of any arrangement with Correspondent.

Correspondent and CMI acknowledge that each will be providing the other party with valuable proprietary information ("Confidential Information"), including but not limited to information regarding CMI's or Correspondent's products, programs, underwriting policies, procedures and customers. Except as necessary to perform its obligations under this Agreement or as required by law, each party will not disclose any Confidential Information to any person outside that party's organization and will limit access to this information within its organization on a strict "need to know" basis. Each party agrees to notify all of its directors, officers, employees and other agents of its obligations regarding Confidential Information and will cause such directors, officers, employees and other agents to comply with such obligations.

7. TERMINATION

CMI may immediately terminate this Agreement without notice and CMI then will have no further obligations under this Agreement upon: (1) the failure of Correspondent to perform or abide by any term, condition, covenant or obligation contained in this Agreement or the CMI Manual; (2) the finding by CMI that any representation or warranty made by Correspondent is false or incorrect in any material respect; (3) commencement by or against Correspondent of any bankruptcy, insolvency or similar proceedings; (4) CMI's determination that Correspondent's actions contravene the terms and conditions of this Agreement or could adversely impact CMI's activities or reputation; or (5) the failure of loans sold by Correspondent to CMI pursuant to this Agreement to satisfy CMI's expectations regarding loan quality and/or performance.

Either party may terminate this Agreement for any other reason upon thirty (30) calendar days prior notice to the other. In the event of termination, Correspondent shall fully cooperate with and assist CMI in obtaining the documentation necessary to complete the processing and full resolution of all matters (including but not limited to the delivery of all application and/or closed loan documents and, if applicable, all Loan Insuring documentation) relating to all Loans purchased by CMI.

8. ASSIGNMENT

Correspondent may not assign this Agreement or any of its responsibilities under this Agreement. CMI reserves the right, upon notice to Correspondent, to assign or delegate in whole or in part its obligations and responsibilities under this Agreement to any affiliated entity engaged in the business of residential financing.

9. NON-EXCLUSIVE AGREEMENT

Correspondent's rights under this Agreement are on a non-exclusive basis. CMI shall be free to market its products and services to, and to contract with, other parties and customers as it deems appropriate.

10. INDEMNIFICATION

Correspondent agrees to indemnify and hold CMI harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) Correspondent's performance or failure to perform under the terms, conditions or obligations of this Agreement or the CMI Manual (including but not limited to Correspondent's failure to timely deliver all documents and records associated with or related to all Loans purchased by CMI pursuant to this Agreement), (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant contained this Agreement or the CMI Manual and/or (iii) Correspondent's advertisements, promotions or other activities. This indemnification shall extend to any action or inaction by the directors, officers, employees, agents, independent contractors or other representatives of Correspondent and shall survive the expiration and termination of this Agreement.

11. CURE OR REPURCHASE

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

(i) was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;

(ii) was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan;

(iii) was or is capable of being rescinded by the applicable borrower(s) pursuant to the provisions of any applicable federal (including but not limited to the Truth-In-Lending Act) or state law or regulation;

(iv) must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by Correspondent of any representation, warranty or covenant contained in this Agreement or the CMI Manual or a failure by Correspondent to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; and/or

(v) was subject to an Early Payment Default (as defined in the CMI Manual), an Early Payoff (as defined in the CMI Manual) or any other payment related defect (as defined in the CMI Manual)

Correspondent will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI. If, after receiving such notice from CMI, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, Correspondent shall, within ten (10) business days of Correspondent's receipt of such repurchase request, pay to CMI the Repurchase Price by cashier's check or wire transfer of immediately available federal funds. If such defective Loan is owned by CMI at the time of repurchase by Correspondent, CMI shall, upon receipt of the Repurchase Price, release to Correspondent the related mortgage file and shall execute and deliver such instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan.

Correspondent agrees and acknowledges that the provisions of this Sec. 11 do not, in any way, eliminate, diminish or impair Correspondent's indemnification obligations contained in Sec. 10.

12. GOVERNING LAW; VENUE

This Agreement shall be governed by the laws of the State of Missouri and applicable federal law.

CMI and Correspondent agree that any action, suit or proceeding to enforce or defend any right or obligation under this Agreement or otherwise arising out of either party's performance under this Agreement shall be brought in St. Louis County Circuit Court or the United States District Court for the Eastern District of Missouri and each party irrevocably submits to the jurisdiction of either forum and waives the defense of an inconvenient forum to the maintenance of any such action, suit or proceeding in such state or federal court and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in either forum.

13. NOTICE

All notices to CMI shall be sent in accordance with the applicable provisions of the CMI Manual and shall be addressed according to such provisions.

Prior to or at the time Correspondent executes this Agreement, it shall provide CMI with one or more procedures and addresses for delivering notices pursuant to this Agreement. In addition to these procedures and addresses, Correspondent agrees and acknowledges that CMI may deliver all notices required by this Agreement in writing to Correspondent at the address listed on the last page of this Agreement.

14. MODIFICATION; MERGER; ENTIRE AGREEMENT; NO WAIVER OF RIGHTS

This Agreement may not be modified except by a document or record signed by both CMI and Correspondent. This Agreement (including the CMI Manual) contains the entire agreement of the parties and supersedes all previous agreements (including all amendments thereto) between the parties hereto. Any representations, promises or agreements not contained in this Agreement or the CMI Manual shall have no force or effect. The failure of either party to exercise any right given to it under this Agreement or to insist on strict compliance of any obligation under this Agreement shall not constitute a waiver of any right, including the right to insist on strict compliance in the future.

15. ON-SITE REVIEW AND DOCUMENT COLLECTION

Correspondent shall permit any officer, employee or designated representative of CMI, at any reasonable time during regular business hours and upon reasonable advance notice by CMI, to conduct an examination and audit on Correspondent's premises of any of the processes implemented and documents kept by Correspondent regarding any Loan purchased by CMI pursuant to this Agreement. If Correspondent fails to timely deliver, in accordance with the applicable terms and conditions specified in the CMI Manual, all documents and records associated with or related to any Loan purchased by CMI pursuant to this Agreement, Correspondent shall also give CMI and its officers, employees, or designated representatives reasonable access to Correspondent's premises in order to allow CMI to retrieve, prepare or otherwise obtain all such documents and records. Correspondent shall also make its officers, employees and/or designated representatives available to CMI and shall cooperate with CMI in all such examinations, audits and document and record collection activities.

16. AUTHORITY TO EXECUTE AGREEMENT

Correspondent represents and warrants that it has all requisite power, authority and capacity to enter into this Agreement and to perform all obligations required of it hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary action(s). Correspondent shall, upon request by CMI, execute such supplemental resolutions, acknowledgments and/or certifications as may be reasonably necessary to evidence such power, authority and capacity.

17. CORRESPONDENT GRANT OF LIMITED POWER OF ATTORNEY

Correspondent hereby appoints CMI and the directors, officers, employees, agents, successors and assigns of CMI as its true and lawful attorney-in-fact without right of revocation and with full power of substitution for and in its place and stead to (i) demand and control all sums due on Loans purchased pursuant to this Agreement and to enforce all rights with respect thereto, (ii) endorse, mark, place or otherwise evidence Correspondent's name as payee on all checks, drafts, acceptances or other form of partial or full Loan payment delivered or tendered to CMI, (iii) endorse, mark, place or otherwise evidence Correspondent's name on all notes, mortgages, deeds of trust, and other forms of security instruments or collateral and all assignments, full or partial releases or satisfactions of said mortgages, deeds of trust, and other forms of security instruments or collateral for all Loans purchased pursuant to this Agreement. Correspondent agrees to execute such other documents as CMI may reasonably request to evidence the appointment of CMI as Correspondent's attorney-in-fact.

18. MISCELLANEOUS

All capitalized terms not otherwise defined herein shall have the meanings attributed to them in the CMI Manual. All Section headings are for convenience only and shall not be construed as part of this Agreement. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction and, to accomplish this purpose, the provisions hereof are severable. **This Agreement shall not be effective until signed by both parties.**

IN WITNESS WHEREOF, the duly authorized officers of CMI and Correspondent have executed this Agreement as of the date first above written.

| CITIMORTGAGE, INC. (CMI) | Chicago Bancorp, Inc. (CORRESPONDENT) |
|---|---|
| By [signature] | By [signature] |
| Title VICE PRESIDENT | Title Vice President / CFO |
| Date 8/5/04 | Date 04.12.04 |

RICHARD P. McCOPPIN
Manager Eligibility & Wholesale MIS
CitiMortgage, Inc.
1000 Technology Drive/MS 111
O'Fallon, MO 63304
(636) 261-0151/GEID [redacted]

Correspondent Notice Address:
300 N. Elizabeth St., Ste 3E
Chicago, IL 60607

***NOTE: THE TEXT OF THIS AGREEMENT MAY NOT BE CHANGED IN ANY MANNER WITHOUT THE EXPRESS PERMISSION OF CITIMORTGAGE, INC.***

## Delegated Underwriting Addendum

Term June 30 This Delegated Underwriting Addendum ("Delegated U/W Addendum"), effective as of ~~April 12~~, 20 05 supplements and amends the CitiMortgage, Inc. ("CMI") Correspondent Loan Purchase Agreement (the "Agreement") dated April 12, 20 04 by and between CMI and Chicago Bancorp Inc., ("Correspondent")

WHEREAS, CMI and Correspondent, pursuant to Section 14 of the Agreement, desire to make certain changes to the Agreement in connection with the delegation of certain underwriting functions to Correspondent,

WHEREAS, Citibank, FSB; Citibank (West), FSB; and Citibank, NA (collectively referred to herein as "The Banks") may, from time to time, purchase from CMI certain Loans which are covered by the provisions of this Delegated U/W Addendum, and the parties hereby expressly acknowledge that The Banks are intended third party beneficiaries of the Agreement and this Addendum, and

WHEREAS, Correspondent desires to originate Loans which comply, in all material respects, with the appropriate underwriting criteria established by CMI for the associated Loan product.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, CMI and Correspondent agree as follows:

1) The following paragraphs are added to Section 11 ("Cure or Repurchase") of the Agreement:

Correspondent expressly agrees that it shall underwrite each Loan in conformity with the applicable underwriting criteria of CMI. If an audit by CMI on any Loan reveals that it was underwritten in violation of the applicable CMI underwriting criteria, Correspondent will, not later than thirty (30) days after receipt of written notice from CMI, repurchase the Loan at the Repurchase Price or provide CMI with written evidence as to why Correspondent believes such underwriting criteria was not violated. If, after reviewing Correspondent's written evidence, CMI, in its sole and independent discretion, determines the Loan was not originated in accordance with the applicable underwriting criteria, Correspondent will, not later than thirty (30) days after receiving further written notice from CMI, repurchase the Loan at the Repurchase Price specified in the Agreement, Manual and/or applicable Bulletin(s).

Correspondent expressly agrees and acknowledges that CMI (i) is entitled to independently exercise and/or receive all benefits and remedies of the Agreement, Manual, and this Delegated U/W Addendum with respect to all Loans purchased by CMI and (ii) may, in its sole and independent discretion, terminate the Correspondent's delegated underwriting privileges with respect to all or a specified number of Loan products at any time upon ten (10) days advance written notice to Correspondent of such full or partial termination.

2) Except as amended herein, all other terms and conditions of the Agreement (including but not limited to the remaining provisions of Section 11) shall remain in full force and effect.

3) Capitalized terms not defined in this Delegated U/W Addendum shall have the meanings attributed to them in the Agreement.

4) This Delegated U/W Addendum supersedes and replaces all other delegated underwriting Addendum(s) previously executed by Correspondent and CMI.

IN WITNESS WHEREOF, the duly authorized officers of Correspondent and CMI have executed this Delegated U/W Addendum.

CHICAGO BANCORP, INC. ("Correspondent")

By: ______________________

Name: WARREN P. THOMAS

Title: VICE PRESIDENT

CitiMortgage, Inc. ("CMI")

By: ______________________

Name: RICHARD P. McCOPPIN
Manager Eligibility & Wholesale MIS
CitiMortgage, Inc.
1000 Technology Drive/MS 111
O'Fallon, MO 63304
(636) 261-0151/GEID [redacted]

Title: Vice President

delegatedunderwriting (5/13/04)

**CMI *Select* Addendum**

This Addendum, effective as of 8/15/07 supplements and amends the CitiMortgage, Inc. ("CMI") Correspondent Loan Purchase Agreement ("Agreement") dated 04/12/04 by and between CMI and Chicago Bancorp Inc. ("Correspondent").

*Whereas*, CMI and Correspondent, pursuant to Section 14 of the Agreement, desire to make certain changes to the Agreement in connection with certain Assignment of Trade, Direct Trade and Block Commitments from Correspondent to CMI, as defined in paragraphs 1, 2, 3, and 4 below.

*Now Therefore*, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, CMI and Correspondent agree as follows, and the following paragraphs are added to the Agreement:

1. Block Commitments: From time to time Correspondent will negotiate a mandatory sale of whole Eligible Mortgage Loans on an individual note rate of Same Product, and deliver same pursuant to the Agreement to fulfill a Commitment with CMI; and CMI may agree to purchase the mortgage loans and the servicing rights to same under the terms of this Addendum, the Agreement, and the Commitment.

2. Direct Trade Commitments: From time to time Correspondent will negotiate a mandatory sale of Eligible Mortgage Loans pursuant to a Commitment negotiated and executed directly with CMI and CMI will purchase the Eligible Mortgage Loans and the servicing rights to same under the terms of this Addendum, the Agreement and the Commitment.

3. Assignment of Trade Commitments: Under the terms of the Agreement and this Addendum, Correspondent may negotiate a trade with a CMI-approved Securities Dealer, as defined in section 10. below ("Dealer"), and then subsequently assign the interest in the trade to CMI. Correspondent shall notify CMI that it desires to assign a trade and sell certain Eligible Mortgage Loans and related servicing rights to CMI and CMI may accept such an offer by a written notice from CMI to Correspondent in the form of the Tri-Party Agreement (the form of which is attached hereto as Exhibit A). The following terms and conditions shall apply to all Assignments of Trade:

   A. CMI shall accept Assignments of Trade of GNMA-I, GNMA-II, Fannie Mae or Freddie Mac "to-be-announced" ("TBA") securities from Seller and shall pay Seller the Purchase Price provided for in paragraph 7 of this Addendum for the Eligible Mortgage Loans intended to fulfill the trades which are delivered to CMI pursuant to the terms and procedures set forth in the Agreement.

   B. CMI will accept TBA trades only, specified trades will not be accepted.

   C. The minimum amount for any Assignment of Trade to be accepted by CMI for available Product windows shall be $500,000 ($250,000 for GNMA II).

   D. Trades may only be transacted with CMI approved Dealers.

4. Eligible Mortgage Loans are defined as follows:

   A. For Block Commitments:

      (i) Conventional Conforming ARM Loans eligible for pooling in Fannie Mae or Freddie Mac mortgage-backed securities.

      (ii) Conventional Non-Conforming Fixed Rate and ARM Loans eligible for sale to CMI.

      All Products must meet the Product parameters described in the Agreement in effect at the time of funding.

   B. For Assignment of Trade and Direct Trade Commitments:

      (i) FHA-insured and/or VA-guaranteed mortgage Loans eligible for pooling in GNMA mortgage-backed securities, and

      (ii) Conventional conforming fixed rate Loans eligible for pooling in Fannie Mae or Freddie Mac mortgage-backed securities.

      All Products must meet the Product parameters described in the Correspondent Agreement in effect at the time of funding. Correspondent shall not deliver to CMI any Products acquired from a third party customer which is not approved by FHA/VA or not sponsored by Correspondent to originate loans under FHA/VA programs.

5. Product: Product is defined as Loans eligible for purchase by CMI, according to the applicable terms, conditions, requirements, procedures, representations and warranties set forth in the Agreement.

6. Same Product: Same Product is defined as loans (eligible as above defined) which share similar characteristics with regard to loan type, term, and note rate.

7. Purchase Price:

   A. For Block Commitments, the Purchase Price shall be mutually agreed to by Correspondent and CMI in accordance with the commitment price and any applicable pricing adjusters.

   B. For Assignment of Trade and Direct Trade Commitments, the Purchase Price shall be mutually agreed to by Correspondent and CMI in accordance with the executed trade price and any applicable pricing adjusters.

   C. Upon notification to Correspondent, CMI shall have the right to deduct any fees, penalties, taxes, trade assignment buyout fees, or other charges of any kind owed CMI by Correspondent; from the Purchase Price of any Eligible Mortgage Loans purchased by CMI from Correspondent pursuant to this Addendum or any other agreement between Correspondent and CMI.

8. Tri-Party Agreement: For all Assignment of Trade Commitments, CMI and Correspondent will prepare and execute a Tri-Party Agreement (in the form attached hereto as Exhibit A, as amended from time to time by written notice from CMI to Correspondent) in accordance with the procedures contained in this Addendum. The terms and conditions contained in the Tri-Party Agreement shall define the nature of the specific trade and are binding on the parties.

9. Retention of Risk: Correspondent agrees that it retains all risks that the Dealer will not perform on the trade. If CMI deems, at its sole option that the Dealer is unable to perform, CMI may immediately take any action it deems necessary and prudent in order to minimize its losses, including pairing off, and Correspondent agrees that it will immediately pay CMI any related loss incurred by CMI pursuant to the terms and procedures described in paragraph 14 of this Addendum.

10. Approved Securities Dealers: For all Assignment of Trade Commitments, CMI will only accept trades from Approved Securities Dealers ("Dealers") listed on the form attached hereto as Exhibit B, as amended from time to time by written notice from CMI to Correspondent. If the Correspondent wishes to assign a trade with a Dealer not listed, approval may be sought from CMI. Approval of Dealers is at the complete and sole discretion of CMI and must be in writing, signed by a duly authorized officer of CMI.

11. Correspondent Authorized Trading Contacts: Correspondent hereby authorizes CMI to accept and communicate pricing information to the representatives indicated on the Secondary Marketing Trading Desk Authorized contact List, attached hereto as Exhibit C. The representatives listed are the sole representatives of Correspondent authorized to conduct mortgage transactions with the CMI-Select Desk of CMI. Should this list change, it is the sole responsibility of Correspondent to notify CMI in writing, signed by an authorized signatory from Correspondent.

12. Representations and Warranties:

A. Correspondent hereby makes all representations, warranties and covenants set forth in the Agreement and this Addendum with respect to each Eligible Mortgage Loan delivered to CMI pursuant to this Addendum, as of the date of delivery of each such Eligible Mortgage Loan.

B. Correspondent represents that it will not select Eligible Mortgage Loans in a manner materially adverse to CMI when delivering loans to fulfill a Block Commitment, Assignment of Trade or Direct Trade Commitment. CMI may audit Correspondent's selection procedures during regular business hours to assure itself that the selection procedures are not materially adverse to CMI. In the event CMI reasonably demonstrates that materially adverse selection procedures were used, Correspondent shall within 30 days repurchase and/or replace the affected Loans in accordance with paragraph 11 of the Agreement with Eligible Mortgage Loans selected in a manner which is not materially adverse to CMI. Failure to repurchase or replace any Loan rejected under this subsection may subject Correspondent to those changes, penalties and procedures described in paragraph 7(C) and paragraph 14 of this Addendum.

C. Correspondent has all requisite corporate power, authority and capacity to enter into this Addendum and to perform the obligation required of it hereunder.

D. The execution and performance of this Addendum by Correspondent, its compliance with the terms hereof and the consummation of the transactions contemplated herein will not violate any provision of any law applicable to it and will not conflict with any terms or provisions of its certificate of incorporation or by-laws, or any other instrument relating to the conduct of its business or any other agreement to which Correspondent is a party.

E. No representation, warranty or statement made by Correspondent in this Addendum or other documents prepared by Correspondent contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained in this Addendum or made in any document referred to in the Addendum not misleading.

F. If Correspondent uses a third party to manage its pipeline instead of its own employee(s), the pipeline management vendor must be acceptable to CMI in its sole discretion ("pipeline management vendor"). Correspondent represents and covenants that it will notify CMI immediately if it ceases to utilize the services of the pipeline management vendor. Correspondent's failure to so notify CMI may result in the immediate termination of Correspondent's privileges to conduct business with CMI pursuant to this Addendum. Further, CMI reserves the right to terminate Correspondent's privileges to conduct business with CMI pursuant to this Addendum if Correspondent ceases to utilize the services of the pipeline management vendor.

13. Loan Delivery: CMI will notify Correspondent of the applicable Commitment delivery and funding deadlines for each Commitment obligation. Correspondent agrees to provide CMI with sufficient Eligible Mortgage Loans to fulfill the Commitment by the Commitment delivery deadline as provided at the time of Commitment. Correspondent must deliver Eligible Mortgage Loans with aggregate principal balances within a tolerance of the face amount of the Commitment, as set forth and agreed to by both parties in the Commitment Confirmation (representative samples of which are attached hereto as Exhibit D. Substitutes for rejected Loans will be accepted provided such substitutes are within tolerance of Commitment and received in sufficient amounts to fulfill the obligations created by an Assignment of Trade, Direct Trade or Block Commitment.

14. Loan Review: CMI will review each Loan for credit quality and documentation prior to purchase of the Loan. At its discretion, CMI may reject any Loan, which it reasonably determines does not meet the terms and parameters of the Agreement. Notwithstanding such prior review, Correspondent agrees to repurchase on CMI's demand any Loan which is unacceptable to CMI, GNMA, Freddie Mac or Fannie Mae as the result of any defects which are not cured by Correspondent within the time period specified by CMI.

15. Failure to deliver: In the event CMI does not receive from Correspondent sufficient Eligible Mortgage Loans to fulfill the obligations created under this addendum, Correspondent shall contact the CMI representative to either arrange for an extension (which extension shall be granted at the sole discretion of CMI) or to pair out of the Commitment. Any and all fees, penalties, taxes, trade assignments, buy-out fees or other charges of any kind, whether incurred and assessed by outside entities or incurred internally by CMI, shall be charged to Correspondent and are due and payable to CMI immediately. CMI shall prepare an itemized statement of such charges and provide same to Correspondent. Failure to remit payment shall constitute an event of default under the Agreement and CMI shall be entitled to all remedies provided by the Agreement and at law. For deliveries which exceed the committed amount, CMI will contact Correspondent to establish the price for excess delivery amount.

16. Correspondent acknowledges that it has received and read the Agreement. All provisions of this Addendum are incorporated by reference into the Agreement, and shall be binding upon Correspondent and CMI. Specific references in this Addendum to particular provisions of the Agreement and not to other provisions do not mean that those provisions of the Agreement not specifically cited in the Addendum are not applicable. All terms used herein shall have the same meaning as the terms have in the Agreement, unless otherwise defined herein, or the context clearly requires otherwise. In the event of any conflict between the provisions of this Addendum and the provisions of the Agreement, the provision of this Addendum shall control.

17. This Addendum may be terminated upon 10 days written notice from either party. Termination shall not affect the sale and purchase of any Eligible Mortgage Loans agreed to between Correspondent and CMI. All representations, warranties and covenants contained in this Addendum and the Agreement shall survive the termination of this Addendum.

**Chicago Bancorp Inc.**
("Correspondent")

By: Charles O Smith

Name: CHARLES O. SMITH

Title: DIRECTOR OF SECONDARY MARKETING

**CitiMortgage, Inc.**

By: Bryan Barker

Name:

Title:

**BRYAN BARKER**
**Eligibility Manager**
**Counterparty Risk Management**
**CitiMortgage, Inc.**
1000 Technology Drive / **MS 111**
O'Fallon, MO 63368-2240
(636) 261-0152 / GEID# [redacted]

39230