UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CITIMORTGAGE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14CV01278 AGF |
| | ) | |
| CHICAGO BANCORP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the cross motions for partial summary judgment filed by Plaintiff CitiMortgage, Inc. ("CMI") and Defendants Stephen and John Calk (the "Calks") and The Federal Savings Bank ("FSB").[1] CMI's claims against these Defendants seek to hold them liable for the contract liability of the primary Defendant, Chicago Bancorp, Inc. ("Chicago Bancorp"), on theories of fraudulent transfer, alter ego, and successor liability.

CMI seeks summary judgment against the Calks on Counts III (statutory fraudulent transfer) and IV (alter ego), and against FSB on Count V (successor liability), of its Third Amended Complaint. (Doc. Nos. 240 & 241.) CMI has also moved to exclude the opinions of defense experts Thomas Zetlmeisl and Terry Stroud. (Doc. Nos. 143 & 148.)

---

[1]    Defendant National Bancorp Holdings, Inc., was also originally a party to these motions, but CMI has since voluntarily dismissed this Defendant with prejudice.

The Calks and FSB seek summary judgment on Counts IV and V. (Doc. No. 246.) FSB has also moved to exclude the opinions of CMI expert Donna Beck Smith. (Doc. No. 153.) For the reasons set forth below, the Court will deny CMI's motions for partial summary judgment and grant Defendants' motion for partial summary judgment. The Court will also ask the parties to advise the Court, within seven days of the date of this Order, whether their expert-related motions are moot in light of these rulings.

## BACKGROUND

For purposes of the motions before the Court, the record establishes the following. Chicago Bancorp was a state-licensed mortgage company incorporated in Illinois on October 24, 1995. During all relevant times, it was a closely-held sub-chapter S corporation and was licensed to originate residential mortgage loans in 33 states. Defendants Stephen Calk and John Calk were the sole shareholders and directors of Chicago Bancorp, and the two alternately served as the company's president. Stephen Calk owned 70% of Chicago Bancorp's stock, and John Calk owned 30%. Chicago Bancorp issued stock to its shareholders, held annual meetings of its board of directors or executed joint consents in lieu of such meetings, elected officers, had its own bank accounts separate from the Calks, filed its own tax returns, and issued audited financial statements.

On April 12, 2004, CMI entered into a contract with Chicago Bancorp, whereby CMI would, from time to time, purchase residential mortgage loans from Chicago Bancorp. The contract gave CMI the right to require Chicago Bancorp to cure or correct any loan that CMI, in its sole and exclusive discretion, determined was defective in any

of a number of ways.  If Chicago Bancorp failed to do so, CMI could demand that

Chicago Bancorp repurchase the loan for a specified repurchase price, determined by a

contractual formula.[2]  The contract did not require Chicago Bancorp to continue to

conduct business, but it did require Chicago Bancorp to warrant, throughout the term of

the Agreement, that it was solvent, and it required Chicago Bancorp to immediately

notify CMI of any material change in financial status or ownership.  CMI never requested

or obtained a guaranty from the Calks with respect to its contract with Chicago Bancorp.

CMI suspended its relationship with Chicago Bancorp in August 2009.

Chicago Bancorp made a profit in each year from 2009 through 2011, though its

profits decreased over this time.  Chicago Bancorp also paid distributions to its

shareholders, the Calks, in each of these years, but it did so without a formal resolution or

vote of its board of directors (also comprised solely of the Calks).

---

[2]     The "Repurchase Price" was defined as:

> [T]he sum of:  (i) the current principal balance on the loan as of the paid-to
> date; (ii) the accrued interest calculated at the mortgage loan Note rate from
> the mortgage loan paid-to date up to and including the repurchase date; (iii)
> all unreimbursed advances (including but not limited to tax and insurance
> advances, delinquency and/or foreclosure expenses, etc.) incurred in
> connection with the servicing of the mortgage loan; (iv) any price paid in
> excess of par by CitiMortgage on the funding date; and (v) any other fees,
> costs, or expenses charged by or paid to another investor in connection with
> the repurchase of the mortgage loan from such investor but only to the
> extent such fees, costs and expenses exceed the total of items (i) through
> (iv) above.

(Doc. No. 253-10 at 8.)

## The Calks' Acquisition of FSB During Chicago Bancorp's Wind-Down

On April 4, 2011, National Bancorp Holding, Inc. ("NBH"), a former Defendant in this case that is wholly owned by the Calks, acquired FSB. At the time, FSB was known as Generations Bank, it was a federally-chartered thrift institution, and its only office was located in Overland Park, Kansas.

Generations Bank's residential mortgage operations had been dormant for two to three years prior to its acquisition by NBH. At the time of its acquisition, Generations Bank's primary federal regulator was the federal Office of Thrift Supervision ("OTS"), but OTS later became a part of and was replaced by the federal Office of Comptroller of the Currency ("OCC"). Federal regulators were aware of the Calks' ownership of Chicago Bancorp and NBH, and they approved NBH's purchase of Generations Bank. Generations Bank changed its name to FSB effective May 31, 2011.

Between March 31 and December 1, 2011, Chicago Bancorp terminated at least eight employees at the direction of the Calks, and each employee was immediately or shortly thereafter hired by FSB, also at the Calks' direction. Two of these employees, Javier Ubarri and James Norini (who eventually became FSB's chief executive officer and chief operating officer, respectively), appeared on the Chicago Bancorp payroll for nearly three months with job titles listed as "FSB" before they were terminated by Chicago Bancorp and hired by FSB. CMI suggests that an additional employee may have begun working for FSB while still employed by Chicago Bancorp, but FSB disputes this, asserting that the employee never worked for both companies at the same time. The

parties also dispute whether a few other Chicago Bancorp employees worked on FSB loans while still employed by Chicago Bancorp.

On January 25, 2012, after receiving no objection from the OCC, Stephan Calk informed the FSB board that FSB would be opening two loan production offices in the Chicago, Illinois area. FSB leased the same Chicago offices formerly used by Chicago Bancorp: one in Naperville, Illinois and one in downtown Chicago. FSB was directly assigned Chicago Bancorp's lease for the downtown Chicago office, and that office became FSB's headquarters.

From February to May 2012, Chicago Bancorp terminated several more employees in its Chicago offices, and these employees were immediately or shortly thereafter hired by FSB. From May to September 2012, Chicago Bancorp terminated employees in its New York and California offices, and these employees, too, were immediately or shortly thereafter hired by FSB. FSB also opened New York and California offices at the same addresses as Chicago Bancorp's former offices in these states.

In total, FSB hired 197 former Chicago Bancorp employees, which represented most of Chicago Bancorp's employees. These employees did not take any loans originated at Chicago Bancorp with them to FSB. All Chicago Bancorp loans were liquidated such that no Chicago Bancorp loan was closed by FSB. Further, FSB entered into new contracts with sources of loan origination leads, such as Lending Tree, that were independent of Chicago Bancorp's contracts with those sources.

FSB made federal OCC regulators aware of its hiring of former Chicago Bancorp employees and use of former Chicago Bancorp office space. In addition to the former Chicago Bancorp employees, FSB hired numerous other employees unaffiliated with Chicago Bancorp. FSB also opened new offices that were not former Chicago Bancorp offices.

FSB is a federally-chartered depository savings bank. Unlike Chicago Bancorp, FSB's business is not limited to residential mortgage loan origination. It also issues credit cards, takes public deposits, and issues commercial and construction loans. Further, whereas Chicago Bancorp was a state-chartered mortgage company requiring a license to operate in each state it did business, FSB originates residential mortgage loans nationwide without having to be licensed by individual state authorities. Finally, whereas Chicago Bancorp relied on warehouse lines of credit to fund origination of mortgage loans, FSB uses bank deposits to finance mortgage lending.

## CMI's Claims Against Chicago Bancorp for Loan Repurchase

Beginning around August 25, 2011, and continuing through the time Chicago Bancorp was winding down operations and FSB was expanding, CMI sent Chicago Bancorp a series of repurchase demands for loans it found to be defective under the parties' contract. These repurchase demands eventually resulted in two lawsuits against Chicago Bancorp. The first lawsuit was filed on February 10, 2012, claiming that Chicago Bancorp breached its contractual obligation to repurchase 11 loans under the parties' contract, and alleging damages in excess of $2,000,000. *See CitiMortgage, Inc.*

*v. Chicago Bancorp, Inc.*, Case No. 4:12-CV-00246 ("*Chicago Bancorp I*"). The second lawsuit was this lawsuit.

With respect to the loans at issue in this lawsuit, CMI made a series of repurchase demands for repurchase prices accruing in the following amounts:

| Through end of December 2011 | $3,430,473.79 |
| Through end of January 2012 | $3,705,408.68 |
| Through end of February 2012 | $3,818,671.28 |
| Through end of March 2012 | $4,230,382.88 |
| Through end of April 2012 | $4,230,382.88 |
| Through end of May 2012 | $4,230,382.88 |

(Doc. No. 322 at 23-25 & Doc. No. 252-145 at 2.) CMI did not file suit on these and later repurchase demands until it filed this lawsuit on July 21, 2014.

**Chicago Bancorp's Distributions to the Calks and Subsequent Dissolution**

Over the course of 2012, Chicago Bancorp's profits decreased significantly. From January to December 2012, Chicago Bancorp had the following book value, or shareholder's equity:

| End of January 2012 | $5,857,424.59 |
| End of February 2012 | $6,460,145.54 |
| End of March 2012 | $6,206,244.81 |
| End of April 2012 | $5,541,530.95 |
| End of May 2012 | $4,824,437.74 |
| End of June 2012 | $4,830,521.39 |
| End of July 2012 | $4,837,850.18 |
| End of August 2012 | $5,031,311.55 |
| End of September 2012 | $3,820,449.89 |
| End of October 2012 | $2,721,136.64 |
| End of November 2012 | $2,629,339.49 |
| End of December 2012 | $1,639,640.70. |

(Doc. No. 322 at 15-18.)

During this time, Chicago Bancorp made distributions in the following

approximate amounts to its shareholders, the Calks:

| January 2012 | $123,519 |
| March 2012 | $873,000 |
| April 2012 | $1,000,000 |
| May 2012 | $1,000,000 |
| October 2012 | $1,000,000 |
| December 2012 | $785,385 |

(Doc. No. 252 at 24, 36-37, 40-41, 53, 55.) [3] There were no board resolutions, minutes,

or other documents authorizing these distributions. Stephen Calk received 70% of the

distributions, and John Calk received 30%.

The nature of these distributions is unclear from the record. The Calks have most

frequently referred to them as "post-tax retained earnings" (Doc. No. 249 at 1), but at one

point described them as "dividend distributions" (Doc. No. 305 at 41.)

In May 2012, the Calks made a $2,000,000 capital contribution to FSB through

their holding company, NBH. The parties dispute whether this $2,000,000 million was

part of the more than $4,600,000 million that the Calks received from Chicago Bancorp.

Chicago Bancorp was voluntarily dissolved with the Illinois Secretary of State,

effective January 4, 2013. This dissolution was authorized by written consent of Chicago

Bancorp's shareholders in lieu of a special meeting, and Chicago Bancorp filed articles of

dissolution with the Illinois Secretary of State. Chicago Bancorp's largest asset,

---

[3] These figures (totaling $4,781,904) are the only monthly breakdowns of the year
2012 distributions that the parties have provided to the Court. Both sides agree that these
monthly numbers are based on unaudited figures that did not receive year-end
adjustments and that the total amount that Chicago Bancorp paid the Calks in 2012 was
actually $4,618,900. However, because both sides have used the unaudited monthly
figures for the purpose of their analysis, the Court will do the same.

constituting over 90% of its total assets, was its inventory of loans.  This inventory of loans was liquidated to pay off a nearly $60,000,000 warehouse line of credit and other associated liabilities.  Chicago Bancorp's state licenses were terminated.

In May 2013, the Calks returned approximately $1,778,035 to Chicago Bancorp so that Chicago Bancorp could pay CMI a judgment in *Chicago Bancorp I*.  Judgment was entered in *Chicago Bancorp I* on January 23, 2015 in the amount of $1,283,068.07.[4]

## ARGUMENTS OF THE PARTIES

### Count III (Statutory Fraudulent Transfer)

In support of its motion for summary judgment on Count III, CMI argues that the Calks are liable under the constructive fraud provisions of the Missouri Uniform Fraudulent Transfer Act, Mo. Rev. Stat. § 428.029.  CMI argues that the undisputed evidence satisfies all three elements of a constructive fraudulent transfer claim:  (1) its claims in this case arose before Chicago Bancorp completed its distributions to the Calks in 2012; (2) Chicago Bancorp did not receive reasonable value in exchange for the distributions to the Calks; and (3) the distributions paid to the Calks rendered Chicago Bancorp insolvent because Chicago Bancorp's debts to CMI (by virtue of CMI's claims in *Chicago Bancorp I* and its repurchase demands for the loans at issue in this case) exceeded Chicago Bancorp's assets at the time.  CMI asserts that it is entitled to a judgment on Count III against the Calks in the amount each of them received of the more

---

[4]      This judgment was lower than the amount originally claimed by CMI because CMI voluntarily dismissed some of its claims.

than $4,600,000 in distributions from Chicago Bancorp (70% for Stephen Calk and 30% for John Calk).

The Calks argue that summary judgment in CMI's favor should be denied because there is a material question of fact as to whether Chicago Bancorp was insolvent at the time of each of the six transfers or became insolvent as a result of any one of the transfers.[5]  Specifically, the Calks contend that questions of fact remain as to the fair valuation of Chicago Bancorp's debts and assets at the time of the transfers.  The Calks argue that any debt ascribed to CMI's repurchase demands should be discounted to account for the uncertainty as to whether the demands would ripen into a judgment against Chicago Bancorp.  The Calks further argue that Chicago Bancorp's assets should be adjusted to account for contingent assets in the form of return of the underlying notes or collateral that would come with any repurchase of a loan by Chicago Bancorp.  The Calks maintain that, if such adjustments were applied, a jury could find that Chicago Bancorp was solvent at the time of some or all of the transfers.  Finally, the Calks argue that there is evidence that Chicago Bancorp received reasonably equivalent value for at least the last two transfers—in October and December 2012—because the Calks later (in

---

[5]    The Calks also argue that Illinois law, rather than Missouri law, governs Count III with respect to whether punitive damages are permitted.  However, CMI asserts that it is not seeking punitive damages on Count III for purposes of this summary judgment motion.  And the parties agree that the constructive fraud provisions of the Missouri and Illinois Uniform Fraudulent Transfer Acts are otherwise identical.  Therefore, the Court need not engage decide which state's law applies.  *See Bacon v. Liberty Mut. Ins. Co*., 688 F.3d 362, 366 (8th Cir. 2012) (holding that "no choice-of-law analysis is required" when "no true conflict exists" between the two states' laws).

early 2013) returned roughly the same amount of money to Chicago Bancorp in order to pay the judgment against it in *Chicago Bancorp I*.

In reply, CMI admits that the January 2012 transfer may not have rendered Chicago Bancorp insolvent[6] but argues that the remaining transfers undisputedly did. CMI argues that, under the plain language of the fraudulent transfer statute, there is no basis to discount its repurchase demands when determining Chicago Bancorp's solvency. CMI rejects the Calks' assertion that the value of CMI's repurchase demands at the time of the transfers was uncertain simply because the repurchase demands had not yet been reduced to judgment. Further, although CMI does not dispute that its repurchase demands encompassed a return of the underlying notes or collateral to Chicago Bancorp (in return for the repurchase price), CMI asserts that there is no basis to account for this potential for returned assets in measuring Chicago Bancorp's solvency under the statute. Finally, CMI argues that the Calks' return of some funds to Chicago Bancorp to pay the *Chicago Bancorp I* judgment could not have provided reasonably equivalent value "in exchange" for these transfers because it was not contemporaneous with the transfers.

## Count IV (Alter Ego)

CMI argues that it is entitled to summary judgment against the Calks on Count IV because its undisputed evidence satisfies both prongs for alter-ego liability under Illinois[7] law: (1) there was such a unity of interest and ownership that the separate personalities

---

[6]     CMI suggests that "[t]he Court can delete the January distribution from the [fraudulent transfer] claim." (Doc. No. 320 at 7 n.3.)

[7]     The parties agree that Illinois law governs Counts IV and V.

of Chicago Bancorp and the Calks as individuals no longer existed, and (2) adherence to the separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. CMI asserts that a unity of interest and ownership is demonstrated by Chicago Bancorp's failure to observe corporate formalities; Chicago Bancorp's insufficient capitalization and its insolvency after 2012; Chicago Bancorp's diversion of assets in the form of shareholder distributions to the detriment of its creditor, CMI; the Calks' failure to maintain an arm's-length relationship between Chicago Bancorp and FSB by transferring employees and office space from one to the other; and the Calks' complete control over Chicago Bancorp. CMI further asserts that failing to impute Chicago Bancorp's liability to the Calks would promote injustice because it would deprive CMI of its ability to collect a judgment.

In opposition to CMI's motion for summary judgment and in support of their own motion for summary judgment on Count IV, the Calks argue that CMI's equitable alter-ego claim fails because CMI has an adequate remedy at law by virtue of its statutory fraudulent transfer claim. The Calks further argue that CMI has failed to demonstrate either the unity of interest or injustice required to pierce the corporate veil under Illinois law.

With respect to the unity-of-interest prong, the Calks argue that CMI has failed to demonstrate that Chicago Bancorp was merely a sham for the Calks. The Calks contend that, rather, the evidence shows that Chicago Bancorp was adequately capitalized at the time of incorporation and operated profitably for several years; Chicago Bancorp issued stock, paid dividends, and observed the corporate formalities commensurate with its

status as a closely-held sub-chapter S corporation; Chicago Bancorp did not commingle funds with the Calks; Chicago Bancorp and FSB operated as separate entities dealing with separate loans and did not transact business with each other; and any transfer of employees or office space between the two companies would show, at most, an intermingling of assets between Chicago Bancorp and FSB, not between Chicago Bancorp and the Calks. The Calks further argue that, although improper diversion of assets may be a factor in determining unity of interest, Chicago Bancorp's 2012 distributions to the Calks were merely dividend distributions and therefore not improper, and to the extent they were improper, CMI may recover separately under its fraudulent transfer claim.

With respect to the interests-of-justice prong of an alter-ego claim, the Calks argue that CMI cannot show that failing to pierce the corporate veil would sanction a fraud, The Calks contend that CMI voluntarily and knowingly entered into its contract with Chicago Bancorp, with the risk that Chicago Bancorp could shut down, and that CMI could have negotiated a guarantee from the Calks but failed to do so. Finally, the Calks argue that there is a question of fact as to whether their affirmative defenses of unclean hands and laches[8] preclude summary judgment in favor of CMI on its alter ego claim.

In a reply in support of its own motion and in response to the Calks' motion for summary judgment on Count IV, CMI argues that its fraudulent transfer claim is not a sufficiently adequate remedy at law to bar its equitable alter-ego claim. CMI contends

_____

[8]     In these defenses, the Calks and FSB assert that CMI waited too long to sue, or otherwise acted inequitably in asserting its claims in this lawsuit.

that its remedy under the Uniform Fraudulent Transfer Act would be limited to the amount of the money transferred, which is less than a third of its total contract damages. CMI further reasserts that the record, on balance, satisfies both prongs of its alter-ego claim.

With respect to the unity-of-interest prong, CMI argues in its response/reply that the Court should focus on the Calks' stripping of Chicago Bancorp's assets in 2012, which rendered Chicago Bancorp undercapitalized, was not properly documented or memorialized, and was intended to divert assets from Chicago Bancorp's creditors. CMI further contends that, although its alter-ego claim is directed at the Calks, not FSB, the Calks maintained such control over both Chicago Bancorp and FSB that any intermingling of assets between the two weighs in favor of imputing liability to the Calks.

With respect to the interests-of-justice prong, CMI argues in its response/reply that it was not required to anticipate the Calks' misconduct and protect against it with contractual guarantees. In any event, CMI argues, the contract it entered into with Chicago Bancorp required Chicago Bancorp to provide notice of any change in financial status so that CMI could prevent the kind of fraudulent transfers that occurred here. Finally, CMI argues that the Calks' affirmative defenses of laches and unclean hands are without merit.

**Count V (Successor Liability)**

CMI's Third Amended Complaint asserts successor liability claims against FSB under theories of *de facto* merger and mere continuation. However, in response to FSB's motion for summary judgment on this claim, CMI abandons its mere continuation claim

and asserts that it is proceeding solely on a *de facto* merger theory. As to the *de facto* merger claim, CMI argues that summary judgment is warranted because its uncontroverted evidence satisfies the elements of such a claim: (1) the business enterprise constituting Chicago Bancorp continued within FSB by virtue of the transfer of employees, offices, and equipment; (2) the shareholders of the two companies are the same because the Calks owned Chicago Bancorp and the Calks' holding company, NBH, owned FSB; (3) Chicago Bancorp ceased operations as a separate entity and dissolved; and (4) FSB indirectly assumed the liabilities and obligations necessary for the continuous operation of Chicago Bancorp's mortgage origination business by taking on Chicago Bancorp's employees and office space leases.

In opposition to CMI's motion and in support of its own motion for summary judgment on Count V, FSB argues that CMI's *de facto* merger claim is preempted by the federal regulations governing federal depository banks such as FSB. Further, FSB argues that CMI's *de facto* merger claim fails on the merits because CMI cannot prove that all or substantially all of Chicago Bancorp's assets were transferred to FSB, as required for such a claim.

FSB contends that Chicago Bancorp's largest asset—its inventory of loans for sale in the secondary market—was undisputedly not transferred to FSB and was instead liquidated to pay off Chicago Bancorp's warehouse line of credit and other associated liabilities. Further, FSB argues that it did not continue Chicago Bancorp's business or assume its obligations because any former Chicago Bancorp employees FSB hired were first terminated by Chicago Bancorp. FSB adds that it also hired outside employees, it

maintained some different offices than Chicago Bancorp, the two companies were governed by different policies and regulations, Chicago Bancorp's state licenses were not transferred to FSB, and it is disputed whether employees used the same equipment and software at both companies. Next, FSB argues that Chicago Bancorp did not dissolve until two years after FSB opened. Finally, FSB argues that its affirmative defenses of laches and unclean hands defeat CMI's *de facto* merger claim.

In a reply in support of its own motion and in response to FSB's motion for summary judgment on Count V, CMI argues that FSB has failed to demonstrate federal preemption because it has failed to point to any federal regulation conflicting with CMI's *de facto* merger claim. With respect to the merits of its *de facto* merger claim, CMI argues that although Chicago Bancorp did not transfer its inventory of loans to FSB directly, Chicago Bancorp's assets were transferred to FSB indirectly because the Calks may have used $2,000,000 of funds received from Chicago Bancorp to make a capital contribution to FSB in May 2012. CMI also argues that the transition of employees from Chicago Bancorp to FSB demonstrates a transfer of substantial assets, and that while this transition took place, Chicago Bancorp effectively dissolved because it stopped originating mortgage loans. Finally, CMI asserts that FSB's laches and unclean hands defenses are without merit with respect to the *de facto* merger claim, as they are with respect to the alter-ego claim.

## DISCUSSION

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts must view the facts in the light most favorable to the non-moving party and resolve all doubts against the moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## Count III (Statutory Fraudulent Transfer)

"In general, the law of fraudulent conveyances permits an injured creditor to set aside a transfer of assets by the debtor made with actual or constructive intent to defraud one or more creditors." *Stanko v. C.I.R.*, 209 F.3d 1082, 1084 (8th Cir. 2000). Under the Illinois and Missouri Uniform Fraudulent Transfer Acts (the "Act"), a creditor need not show actual intent to defraud and may instead rely on a "constructive fraud" theory. *Higgins v. Ferrari*, 474 S.W.3d 630, 639-40 (Mo. Ct. App. 2015); *see also Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 719 (7th Cir. 2002) (applying Illinois law). For purposes of its summary judgment motion, CMI relies only on a constructive fraud theory.

Specifically, CMI relies on the following provision of the Act:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation. [9]

740 Ill. Comp. Stat. 160/6(a). The Act defines a "debtor" as "a person who is liable on a claim" and a "creditor" as a "person who has a claim." 740 Ill. Comp. Stat. 160/2(d), (f). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 740 Ill. Comp. Stat. 160/2(c). There is no dispute that Chicago Bancorp is a debtor and CMI a creditor under the Act.

CMI's repurchase demands for the loans at issue in this lawsuit constitute "claims" as that term is defined under the Act, because they asserted rights to payment under the parties' contract, even if they were disputed and not yet reduced to judgment. Those claims arose before the first transfer at issue in this lawsuit, and continued to accrue throughout the remaining transfers. Additionally, CMI's claims in its *Chicago Bancorp I* lawsuit constitute "claims" under the Act and arose before the March 2012 and later transfers to the Calks. *See Curtis v. James*, 459 S.W.3d 471, 475 (Mo. Ct. App. 2015) ("[A] pending or threatened lawsuit is a 'claim' under the Uniform Fraudulent Transfer Act.").

---

[9] As discussed above, the Missouri Act contains identical provisions. *See* Mo. Rev. Stat. § 428.029.1. However, to simplify, the Court will primarily refer to the Illinois Act.

A debtor is rendered "insolvent" under the Act if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 Ill. Comp. Stat. 160/3. A "debt" is defined as "liability on a claim," and again, a "claim" is simply "a right to payment," regardless of whether that right is "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 740 Ill. Comp. Stat. 160/2(c), (e).

CMI concedes that the January 2012 transfer may not have rendered Chicago Bancorp insolvent. With respect to the March 2012 and later transfers, the Court concludes that a material question of fact remains as to Chicago Bancorp's solvency at the time. By the end of February 2012, CMI had already filed its claims in *Chicago Bancorp I*, alleging that Chicago Bancorp was liable for more than $2,000,000 in damages, and had also sent Chicago Bancorp repurchase demands for the loans at issue in this case with alleged damages totaling $3,818,671.28. Thus, CMI's claims against Chicago Bancorp at the end of February 2012 totaled $5,818,671.28. By the Calks' own description, Chicago Bancorp's assets at the end of February 2012 totaled $6,460,145.54. The March 2012 transfer of $873,000 reduced those assets to $5,587,145.54. Therefore, absent some adjustment to the value of Chicago Bancorp's debts or assets, the March 2012 transfer would appear to have rendered Chicago Bancorp insolvent.[10] As explained below, the Court believes that some adjustment may need to be made, not to discount Chicago Bancorp's liability on CMI's claims (as the Calks assert), but to account for the

---

[10]     After the March 2012 transfer, Chicago Bancorp's assets continued to decrease while its liability on CMI's claims increased (by virtue of more repurchase demands).

potential for return of the underlying notes or collateral to Chicago Bancorp if Chicago Bancorp in fact repurchased any of the loans at issue in CMI's repurchase demands.

The Calks correctly assert that, under the Act, the fair valuation of a debtor's liability on a claim at the time of the transfer may depend on whether liability was certain or contingent at that time. "By definition, a contingent liability is not certain-and often is highly unlikely-ever to become an actual liability." *Baldi v. Samuel Son & Co*., 548 F.3d 579, 582 (7th Cir. 2008) (applying Illinois law). Therefore, for purposes of determining insolvency under the Act and similar bankruptcy statutes that define insolvency in terms of liabilities exceeding assets, "[t]o value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." *Id.*

But before applying such a discount, the Court must first determine whether the liability was contingent at the time of the transfer. As several courts have held, a claim is contingent as to liability "if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a *future* event and such *future* occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created." *In re Imagine Fulfillment Servs., LLC*, 489 B.R. 136, 148 (Bankr. C.D. Cal. 2013) (citing cases); *see also Freeland v. Enodis Corp*., 540 F.3d 721, 730 (7th Cir. 2008) ("A contingent liability is one that depends on a future event that may not even occur to fix either its existence or its amount."). "On the other hand, if a legal obligation to pay arose at the time of the original relationship, but that obligation is subject to being avoided by some future event or occurrence, the claim is not contingent

as to liability, although it may be disputed as to liability for various reasons." *In re Imagine Fulfillment Servs.*, 489 B.R. at 148 (citation omitted).

Liability on CMI's claims was not contingent at the time of the transfers. Chicago Bancorp may have disputed its liability at the time (and to this day), but its liability did not depend on the occurrence of an extrinsic future event. Rather, Chicago Bancorp's liability was fixed at the time by the explicit terms of its contract with CMI, which required Chicago Bancorp to repurchase, upon demand and for a fixed repurchase price, any loan that CMI determined was defective and that Chicago Bancorp failed to cure. *See Freeland*, 540 F.3d at 731 (finding that a debtor's obligation on a note was not contingent where the notes "provided that they would 'become immediately due and payable at the option of the payee' upon the occurrence of certain specified events, including [the debtor's] failure to make an interest payment" and that "[i]f the Notes were not paid in full when due, [the debtor] was bound to 'pay all costs and expenses of collection'").

But the Court reaches a different conclusion with respect to the Calks' second basis for a balance-sheet adjustment, relating to the return of the underlying notes or collateral to Chicago Bancorp if Chicago Bancorp was able to and did repurchase any of the loans at issue in CMI's repurchase demands. Like contingent liabilities, contingent assets "must be reduced to [their] present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." *Matter of Xonics Photochemical, Inc*., 841 F.2d 198, 200 (7th Cir. 1988). The Court agrees with the Calks that the potential for the return of these underlying notes and collateral may have some

contingent value that should be accounted for in determining Chicago Bancorp's solvency at the time of the transfers. Because the parties have not submitted evidence as to the value of this potential for returned assets at the time of the transfers, a material question of fact remains as to Chicago Bancorp's solvency at the time. [11] Therefore, the Court will deny CMI's motion for summary judgment on Count III.

## Count IV (Alter Ego)

"A corporation is a legal entity that exists separately and distinctly from its shareholders, officers, and directors, who generally are not liable for the corporation's debts." *Fontana v. TLD Builders, Inc*., 362 Ill. App. 3d 491, 500, 840 N.E.2d 767, 775 (Ill. App. Ct. 2005). This limited liability extends even to corporations that are closely held or that have a single shareholder. *Id.* "Piercing the corporate veil is not favored and in general, courts are reluctant to do so." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008). "Accordingly, a party bringing a veil-piercing claim bears the burden of showing that the corporation is in fact a 'dummy or sham' for another person or entity." *Id.*

A corporation's veil will be pierced only when "1) there is such a unity of interest and ownership that the separate personalities of the corporations no longer exist and (2) circumstances exist so that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Gajda*

---

[11]     Because the Court finds that a question of fact remains as to Chicago Bancorp's solvency at the time of the transfers, it need not reach the issue of whether Chicago Bancorp received reasonably equivalent value in exchange for the transfers.

*v. Steel Sols. Firm, Inc.*, 39 N.E.3d 263, 271-72 (Ill. App. Ct. 2015). Although this inquiry is fact-intensive, where the material facts are not in dispute, summary judgment is appropriate. *Laborers' Pension Fund v. Lay-Com, Inc*., 580 F.3d 602, 610 (7th Cir. 2009); *SMS Assist L.L.C. v. E. Coast Lot & Pavement Maint. Corp*., 913 F. Supp. 2d 612, 631 (N.D. Ill. 2012) ("Although the veil-piercing analysis involves questions of fact, deciding whether adhering to the fiction of a separate corporate entity would promote injustice is a question for the court, and this court has discretion to decide whether to pierce the corporate veil.").

The Court finds, based on the undisputed facts and viewing the evidence in the light most favorable to CMI, that CMI has not met its burden to pierce the corporate veil. Therefore, the Court will grant the Calks' motion for summary judgment on this claim without reaching their alternative arguments that CMI has an adequate remedy at law or that equitable defenses defeat CMI's claims.

1. Unity of Interest and Ownership

Illinois courts consider several factors to determine if there is a unity of interest and ownership: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of officers or directors other than the dominant stockholders; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of

the dominant stockholders. *Gajda*, 39 N.E.3d at 272. The focus of this "laundry list of factors" is to determine whether the two corporations, or, as in this case, the corporation and its controlling shareholders, "have respected corporate formalities—respected their separateness from each other—or whether one was a sham acting at the whim of the other." *Laborers' Pension Fund*, 580 F.3d at 610-11.

"Undercapitalization is primarily concerned with unencumbered or equity capital, also called 'paid-in' capital, describing the investment made by the shareholders at the establishment of a corporation." *Laborers' Pension Fund*, 580 F.3d at 612 (internal citation omitted). "[A] court will find a corporation to be undercapitalized only when it has so little money that it could not and did not actually operate its nominal business as its own." *Judson Atkinson Candies, Inc.*, 529 F.3d at 379 (quotation omitted). "The fact that a corporation is losing money does not show that it is undercapitalized." *Id.* Here, CMI has not offered any evidence that Chicago Bancorp was undercapitalized at its establishment, and CMI does not dispute that Chicago Bancorp operated with sufficient capital for at least a decade. *Cf. Laborers' Pension Fund*, 580 F.3d at 614 ("Right off the bat, M.A. King needed a steady influx of cash loans from the defendants to keep going. These are all marks of an undercapitalized corporation, propped up by its parent or shareholders.").

It is also undisputed that Chicago Bancorp issued stock and, for the most part, observed corporate formalities and maintained corporate records. Chicago Bancorp held annual meetings of its board of directors or executed joint consents in lieu of such meetings, elected officers, maintained its own bank accounts, filed its own tax returns,

issued audited financial statements, and entered into contracts in its own name.  When Chicago Bancorp dissolved, it did so pursuant to the documented written consent of shareholders, issued public notice, and filed articles of dissolution.

Although CMI argues that Chicago Bancorp did not properly document the transfer of more than $4,600,000 to the Calks and the transfer of employees, any deficiency in this regard is not sufficient to demonstrate that Chicago Bancorp was merely a sham.  *See Judson Atkinson Candies, Inc.*, 529 F.3d 371, 379 (7th Cir. 2008) (finding that a corporation's failure to file tax returns was insufficient evidence of failure to observe corporate formalities where the corporation issued stock certificates, conducted board meetings, and entered into contracts in its own name); *Source One Glob. Partners, LLC v. KGK Synergize, Inc.*, No. 08 C 7403, 2009 WL 2192791, at *4 (N.D. Ill. July 21, 2009) ("If episodes of subpar record keeping were sufficient to establish an alter ego theory, then piercing the corporate veil would become common place and would not be the extraordinary act that it is under Illinois law.").

It is unclear whether Chicago Bancorp paid dividends. The Calks assert that Chicago Bancorp regularly paid dividends from the years 2004 to 2011.  CMI disputes this assertion by arguing that "Chicago Bancorp has no board documentation declaring dividends in any year at least as far back as 2009."  (Doc. No. 320 at 16.)  But in light of the Court's finding as to the other factors, even if Chicago Bancorp did not pay dividends, the Court would not find that factor sufficient to tip the balance in favor of piercing the corporate veil.

CMI does not dispute that Chicago Bancorp maintained its own bank account and did not share expenses with, lend money to, or borrow money from the Calks. *See Flip Side Prods., Inc. v. Jam Prods., Ltd.*, No. 82 C 3684, 1990 WL 186777, at *5 (N.D. Ill. Nov. 8, 1990) ("[S]haring expenses evidences commingling of funds."); *Bankers Trust Co. v. Chicago Title & Trust Co.*, 412 N.E.2d 660, 664 (Ill. App. Ct. 1980) ("No evidence of commingling Romano's funds with Planet's funds appears; to the contrary, a separate corporate bank account was maintained."). The only evidence of commingling of funds offered by CMI is John Calk's testimony that Chicago Bancorp's more than $4,600,000 in distributions to the Calks were "retained earnings, our earnings that were retained already, our personal income was there." (Doc. No. 320 at 18.) This evidence does not demonstrate a pattern of commingling of funds sufficient to pierce the corporate veil.

CMI argues that Chicago Bancorp failed to maintain an arm's-length relationship with FSB because FSB took on Chicago Bancorp's employees and office space. But the Court agrees with the Calks that this fact relates to the unity of interest between Chicago Bancorp and FSB, not Chicago Bancorp and the Calks. *See Bank of Am. v. WS Mgmt., Inc.*, 33 N.E.3d 696, 730-31 (Ill. App. Ct. 2015) (finding evidence that two corporations owned by a single shareholder "operated from the same location, used the same employees, and performed the same management operations," related "to the liability between the two corporations, rather than the personal liability of [the] individual" shareholder); *SMS Assist L.L.C. v. E. Coast Lot & Pavement Maint. Corp.*, 913 F. Supp. 2d 612, 632 (N.D. Ill. 2012) (holding that where a shareholder admitted that his two corporations "shared staff, payroll, and an accounting department" and engaged in inter-

company asset transfers, these facts suggested an intermingling of assets between the two corporations, but not an intermingling of corporate assets between the shareholder and either corporation).

It is undisputed that, although Chicago Bancorp elected functioning officers and directors, the Calks had a dominant role. But such control does not automatically result in personal liability. *See Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 759 (7th Cir. 1989) ("[D]ominant shareholders are almost always 'active participants' in the affairs of an owned corporation."). CMI asserts that the concentration of power is more problematic where, as alleged here, the corporation has diverted assets to the dominant shareholders, to the detriment of its creditor. Indeed, CMI encourages the Court to focus on Chicago Bancorp's transfer of more than $4,600,000 to the Calks for almost all of the unity-of-interest factors, including capitalization, recordkeeping, and solvency. But CMI has a claim to relief for these transfers by way of its fraudulent transfer claim. Beyond these transfers, CMI has not met its burden to impute Chicago Bancorp's liability to the Calks. *See Bank of Am.*, 33 N.E.3d at 733 (holding that fraudulent transfer and alter ego were "different question[s]" and, although a dominant shareholder was liable for fraudulent transfer, the creditor had not shown that the shareholder was the alter ego of the debtor where the debtor "kept records and observed formalities, albeit imperfectly, [was] adequately capitalized to serve [its] purposes, kept funds separate from [the shareholders'] personal expenses, and [was] solvent while operating").

On balance, and viewing the evidence in the light most favorable to CMI, the Court concludes that CMI has not established that Chicago Bancorp was merely a façade

for the Calks.  Rather, the evidence as a whole establishes that Chicago Bancorp was a separate and (for a sufficient time) functioning corporation.

2. Interests of Justice

In light of the ruling on the first element, the Court need not address the second element, namely, the interests of justice.  Nonetheless, on this record, CMI has failed to meet its burden on the second element as well.

 "A promotion of injustice requires something more than the mere prospect of an unsatisfied judgment." *Missak v. Eagle Mkt. Makers, Inc.*, No. 14 C 1757, 2014 WL 2598802, at *2 (N.D. Ill. June 10, 2014) (quotations omitted).  Although the standard is not clear cut, in general, "[i]f a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, that is sufficient, because it is inequitable that shareholders set up such a flimsy organization to escape personal liability."  *Laborers' Pension Fund*, 580 F.3d at 610-11 (quotations omitted).

As discussed above, the evidence does not demonstrate Chicago Bancorp was set up as a sham corporation to escape any potential personal liability of the Calks.  Rather, the evidence demonstrates that Chicago Bancorp operated for years as a functioning corporation.  At most, CMI complains, and may be able to prove, that the transfers Chicago Bancorp made to the Calks in 2012 were intended to defraud CMI.  But the Court need not pierce the corporate veil to avoid sanctioning that alleged fraud.  If the transfers were actually or constructively fraudulent, justice may be served through CMI's

fraudulent transfer claim.   The Court will grant the Calks' motion for summary judgment on CMI's alter-ego claim in Count IV, and will deny CMI's motion on this claim.

## Count V (*De Facto* Merger)

"Generally, when one corporation sells its assets to another corporation, the seller's liabilities do not become a part of the successor corporation absent an agreement providing otherwise." *Steel Co. v. Morgan Marshall Indus., Inc*., 662 N.E.2d 595, 599-600 (Ill. App. Ct. 1996). "There exist four exceptions to this general rule: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Id.* "The second exception has been interpreted to include a *de facto* merger," *id.*, and that is the only exception relied upon by CMI here.

The elements of a *de facto* merger claim are:

1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets and general business operations.

2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

3) The seller corporation ceases its ordinary business operations, liquidates and dissolves as soon as legally and practically possible.

4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Myers v. Putzmeister, Inc*., 596 N.E.2d 754, 756 (Ill. App. Ct. 1992) (citation omitted).

Because the Court finds, based on the undisputed facts and viewing the evidence in the light most favorable to CMI, that CMI has not established the existence of a *de facto* merger, the Court will grant FSB's motion for summary judgment on this claim without reaching its alternative arguments that CMI's claim is preempted by federal law or defeated by FSB's equitable defenses.

As an initial matter, the Court agrees with FSB that the hallmark of a *de facto* merger is the transfer of all or substantially all of a seller corporation's assets to a purchaser corporation—usually by an asset sale and usually in exchange for stock. *See Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 266 (7th Cir. 1996) ("In order for one corporation to be deemed a successor corporation in the first place, it must be a successor to all, or substantially all, of another corporation's assets."); *Travis v. Harris Corp*., 565 F.2d 443, 447 (7th Cir. 1977) (holding that a "major factor in support of a finding of *de facto* merger" is the transfer of stock in consideration for assets).

Here, there was undisputedly no asset sale by Chicago Bancorp to FSB, whether for stock or for cash. And CMI admits that Chicago Bancorp's largest assets—its inventory of loans, representing over 90% of its total assets, and its state licenses necessary to operate—were not transferred to FSB. Moreover, although FSB hired most of Chicago Bancorp's former employees, including management, and took over Chicago Bancorp's former offices and equipment, it did not continue Chicago Bancorp's business

operations in form or in substance. The two companies were fundamentally different in nature, one being a state mortgage company and the other a federally-chartered depository savings bank. Both companies originated mortgage loans, but they did so on a different scale (nationwide versus state-by-state), pursuant to different regulations and licenses (federal versus state), and with different funding sources. FSB also hired several outside employees, obtained new licenses, and entered new contracts, all independent of and unaffiliated with Chicago Bancorp. Therefore, even viewing the facts in the light most favorable to CMI, including assuming that the Calks used $2,000,000 of the more than $4,600,000 they received in transfers from Chicago Bancorp to make a capital contribution to FSB, the Court cannot say that FSB continued the enterprise of Chicago Bancorp. *Cf. Lehman Bros. Holdings v. Gateway Funding Diversified Mortgage Servs., L.P.*, 989 F. Supp. 2d 411, 418 (E.D. Pa. 2013) (finding a *de facto* merger in a loan repurchase case where the successor corporation, pursuant to an asset purchase agreement, purchased "all of the assets used by [the seller corporation] to conduct its mortgage origination business as it is now being conducted," including the "primary asset," its "loan pipeline"), *aff'd*, 785 F.3d 96 (3d Cir. 2015).

With regard to the second element of a *de facto* merger claim, although the Calks were the only shareholders of both Chicago Bancorp and FSB (through NBH), the continuity of shareholders element focuses on a "continuity . . . which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation." *Green v. Firestone Tire*

*& Rubber Co.*, 460 N.E.2d 895, 900 (Ill. App. Ct. 1984) (citation & quotation omitted). As discussed above, no such assets-for-stock exchange took place here.

Regarding the third element, Chicago Bancorp did eventually liquidate and dissolve, but not until two years after the Calks (through their holding company) acquired FSB. The Court finds persuasive CMI's theory that Chicago Bancorp effectively shut down earlier, when most of its employees moved to FSB. But in light of the other elements, the Court does not believe that the series of events here resulted in "the combining of two existing corporations into a single successor corporation," as required for a de facto merger. *See Nilsson v. Cont'l Mach. Mfg. Co.*, 621 N.E.2d 1032, 1034 (Ill. App. 1993).

Finally, FSB did not assume the liabilities and obligations of Chicago Bancorp that were necessary for the uninterrupted business operations of Chicago Bancorp. FSB did not acquire or assume Chicago Bancorp's warehouse line of credit, which was necessary to continue Chicago Bancorp's mortgage origination business, or the balance sheet liability for Chicago Bancorp's loan inventory. *Cf. Lehman Bros.*, 989 F. Supp. 2d at 419 (finding a *de facto* merger where, "[i]n addition to purchasing substantially all of [the seller mortgage origination company's] assets, [the purchaser] also assumed many of its liabilities . . . , including all of [the seller's] warehouse debt, all accounts payable, all accrued payroll, lock fees, escrows, almost all accrued expenses, . . . a loan and a line of credit . . . [, and] all of [the seller's] debt and liabilities related to the [loan] pipeline"). Even the employees and office space leases FSB took over from Chicago Bancorp were, for the most part, first terminated or abandoned by Chicago Bancorp.

On balance, and viewing the evidence in the light most favorable to CMI, the Court finds that CMI has not established a *de facto* merger of Chicago Bancorp and FSB. To the contrary, FSB has established that there are no material facts in dispute that would demonstrate a *de facto* merger here. Therefore, the Court will grant FSB's motion for summary judgment on CMI's successor liability claim in Count V, and will deny CMI's motion on this claim.

**Experts**

The Court did not rely on any expert's opinion in ruling on the motions for summary judgment.[12] Therefore, the various motions to exclude opinions of expert witnesses are moot to the extent they relate to claims resolved here as a matter of law. However, before denying the expert-related motions as moot, the Court will ask the parties to advise the Court, within seven days of the date of this Order, whether any part of their motions to exclude expert testimony relates to the claims remaining in this case, and if so, which part(s).

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Plaintiff CitiMortgage, Inc.'s motions for partial summary judgment against Defendants Stephen Calk and John Calk on Counts III and IV, and against The Federal Savings Bank on Count V, of the Third Amended Complaint are **DENIED**. (Doc. Nos. 240 & 241.)

---

[12] The expert opinions did not address Chicago Bancorp's solvency at the time of the transfers to the Calks, which remains at issue in Count III.

**IT IS FURTHER ORDERED** that Defendants The Federal Savings Bank, Stephen Calk, and John Calk's motion for partial summary judgment on Counts IV and V of Plaintiff's Third Amended Complaint is **GRANTED**.  (Doc. No. 246.)

**IT IS FURTHER ORDERED** that, within **seven (7) days** of the date of this Order, the parties shall file a joint notice advising the Court of whether any part of their motions to exclude expert testimony (Doc. Nos. 143, 148 & 153) relate to the claims remaining in this case, and if so, which part(s).

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 6th day of July, 2016.